*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0465p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JEROME HADLEY,

*Defendant-Appellant.*

No. 03-5838

Appeal from the United States District Court
for the Eastern District of Tennessee at Chattanooga.
No. 02-00147—Curtis L. Collier, Chief District Judge.

Submitted: August 4, 2004

Decided and Filed: December 6, 2005

Before: SUTTON and COOK, Circuit Judges; ROSEN, District Judge.[*]

_____

## COUNSEL

**ON BRIEF:** Frederick Lee Ortwein, ORTWEIN & ORTWEIN, Chattanooga, Tennessee, for Appellant. Tammy Owens Combs, Steven S. Neff, ASSISTANT UNITED STATES ATTORNEY, Chattanooga, Tennessee, for Appellee.

ROSEN, D. J., delivered the opinion of the court. SUTTON, J. (pp. 26-27), delivered a separate opinion concurring in all but parts III.A.1, III.A.3.a and III.A.3.b of Judge Rosen's opinion. COOK, J., joined in the concurrence.

_____

## OPINION

_____

ROSEN, District Judge.

### I. *INTRODUCTION*

Defendant/Appellant Jerome Hadley was charged in a single-count indictment with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). He was found guilty by a jury following a two-day trial, and was sentenced to a 262-month term of imprisonment, a sentence at the bottom of the

_____

[*] The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation.

1

applicable guideline range. Defendant now appeals his conviction and sentence, challenging two of the district court's evidentiary rulings at trial, and also contending that the district court erred at sentencing by relying on uncorroborated hearsay to make a factual finding that increased his sentencing range. In addition, Defendant argues that he is entitled to resentencing under the rule announced in *United States v. Booker,* ___ U.S. ___, 125 S. Ct. 738 (2005), and under this Court's post-*Booker* decisions. We affirm Defendant's conviction, but vacate his sentence and remand for resentencing under the advisory regime that now governs federal sentencing in the wake of *Booker.*

## II. *FACTUAL AND PROCEDURAL BACKGROUND*

### A.     The Events Leading to Defendant's Arrest

In the evening and early morning hours of May 24 and 25, 2002, Defendant Jerome Hadley and his wife, Pattia Hadley, were hosting a few friends and relatives at their residence on North Moore Road in Chattanooga, Tennessee. At around midnight, Mrs. Hadley's friend, Yvette, telephoned 911 from the Hadley residence. This call triggered a police dispatch for an assault in progress, and Chattanooga Police Officer Tyrone Williams heard the dispatch and proceeded to the home. The dispatcher further advised Officer Williams that the 911 call was on an "open line," meaning that the caller was at the scene of the altercation and the 911 operator could hear the incident in progress over the telephone. As Officer Williams drove to the scene, the dispatcher told him that a second 911 call had been received, with the caller urging the police to "hurry up." (11/12/2002 Trial Tr. at 6-7, J.A. at 28-29.)

While driving in her squad car, Chattanooga Police Officer Alicia Jenkins also heard a 911 dispatch for a "domestic disturbance with a gun" at the Hadley residence. Officer Jenkins testified that the dispatch was classified as "Priority 1," meaning that an immediate response was necessary. (*Id.* at 28, J.A. at 41.) Officers Williams and Jenkins arrived at the Hadley residence at about the same time, with Officer Williams estimating that he reached the scene within about two minutes of receiving the initial dispatch.

Both officers testified at trial that upon arriving at the scene, they immediately observed Mrs. Hadley run out of the front door of her home, appearing "hysterical" and "in a state of panic." (*Id.* at 7, 28-29, J.A. at 29, 41-42.) According to the officers, Mrs. Hadley yelled that "he has a gun" and "he's going to kill me." (*Id.* at 7-8, 30, J.A. at 29-30, 43.) Officer Jenkins further recalled Mrs. Hadley stating that "he put a gun up to her head." (*Id.* at 30, J.A. at 43.) In the officers' view, Mrs. Hadley appeared to be visibly upset as she made these remarks; in particular, they recalled that she was "crying," "shaking," and "weeping" at the time, and that she generally lacked "any control of her emotions." (*Id.* at 7, 29-30, J.A. at 29, 42-43.)

After this initial encounter with Mrs. Hadley, Officer Williams entered the residence, identified Defendant Hadley as one of the individuals standing in the dining room area, and asked Defendant about the events in his home that night. Defendant did not respond to the officer's inquiries, but instead challenged the officer's basis for entering his home. When asked whether there was a firearm in the residence, Defendant said, "No. I don't know what you're talking about." (*Id.* at 9, J.A. at 31.) At this point, Officer Williams did a pat-down search of Defendant, left him in the custody of another officer, and went back outside to speak with Mrs. Hadley.

Through their discussion with Mrs. Hadley, Officers Williams and Jenkins learned that there was a gun in the Hadleys' bedroom. The officers then re-entered the house, proceeded to the bedroom, and observed a gun holster on the bedroom floor. Apart from this discovery, however, a limited search of the room failed to uncover any weapons. Accordingly, the officers went back outside to seek further assistance from Mrs. Hadley.

After speaking to Mrs. Hadley for a few more minutes, the officers requested that she accompany them into the house to show them where the gun was located. According to Officer Williams, Mrs. Hadley initially resisted this request, appearing "very frantic [and] very frightened," and stating "that she did not want to come back in the house because she was afraid of what he was going to do to her." (*Id.* at 13, J.A.

at 34.)  After the officers assured her that she would be safe and that Defendant was being kept "off to the side . . . where he could not come after her," Mrs. Hadley agreed to come back into her house.  (*Id.*)

Once inside the home, Mrs. Hadley led the officers into the bedroom, proceeded directly to an armoire, opened one of its drawers, and pointed inside, stating "There it is." (*Id.* at 13-14, 34, J.A. at 34-35, 45.)  The officers looked in the drawer and discovered a loaded .38 caliber revolver.  While another officer escorted Mrs. Hadley back outside, Officer Williams picked up the gun, unloaded five bullets from the weapon, and placed the firearm and ammunition in his patrol car.

After securing the gun, Officer Johnson returned to the house, took Defendant into custody, and placed him in a police car.  Officer Johnson then re-entered the residence with Mrs. Hadley, and he and Officer Jenkins asked her to provide a written statement.  The officers testified that Mrs. Hadley was "still shaking, "trembling," and "very hysterical," but that they eventually were able to calm her down and obtain a written statement.  (*Id.* at 15, 37, J.A. at 36, 46.)  In this statement, Mrs. Hadley wrote that Defendant had "[p]ush[ed] me into the room and would not let [me] out," and that "he held a gun to my head and said he was going to kill me." (5/25/2002 Domestic Violence Victim/Suspect Statement, J.A. at 11.)  Mrs. Hadley further stated that "he said he would kill everyone in the room if I left the house [and] he would shoot in my head." (*Id.*)

Following his arrest, Defendant was charged with the state-law offense of aggravated assault, but this charge subsequently was dismissed.  On September 25, 2002, a federal grand jury returned an indictment in the present case, charging Defendant with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).

## B.    The Trial Proceedings and Challenged Evidentiary Rulings

The case proceeded to trial on November 12 and 13, 2002.  The Government called Officer Williams as a witness, and sought through his testimony to introduce Mrs. Hadley's statements that "[h]e has a gun" and "[h]e's going to kill me."  Defense counsel objected that this testimony was inadmissible hearsay, but the Government asserted that Mrs. Hadley's statements were admissible under Fed. R. Evid. 803(2) as excited utterances.  In response, defense counsel argued that "the incident was [not] going on at that time," so that Mrs. Hadley's statements did not qualify as excited utterances.  (11/12/2002 Trial Tr. at 8, J.A. at 30.)  The district court overruled Defendant's objection and admitted Officer Williams' testimony without elaboration or explanation.  Similarly, the district court overruled Defendant's hearsay objection to Officer Williams' testimony that Mrs. Hadley stated her unwillingness to go back inside her house "because she was afraid of what he was going to do to her." (*Id.* at 13, J.A. at 34.)[1]

The Government also called Officer Jenkins as a witness.  Again, when Officer Jenkins sought to testify regarding Mrs. Hadley's statements when she first emerged from her home, Defendant objected on hearsay grounds, but the district court overruled the objection.  The court later sustained Defendant's objection, however, to the proposed admission of the written statement prepared by Mrs. Hadley after her husband was taken into custody.

The Government then called Ronald Locke, a Hamilton County sheriff's deputy at the county jail where Defendant was incarcerated before trial.  Through this witness, the Government sought to introduce audiotape recordings of two telephone calls purportedly made by Defendant from the jail, one to his

---

[1] Earlier in Officer Williams' testimony, however, the district court sustained Defendant's hearsay objection to the testimony that the 911 dispatcher was able to hear "people screaming and someone saying stop hitting another person" during the initial 911 call from the Hadley residence.  (*Id.* at 6, J.A. at 28.)  In addition, when Officer Williams sought to testify about what Mrs. Hadley had told him regarding the possible location of a gun in the Hadleys' bedroom, the district court agreed with defense counsel that it was not necessary to offer Mrs. Hadley's "specific words" in order to achieve the non-hearsay purpose of this testimony — namely, to explain why Officer Williams proceeded to the bedroom in his initial search for a weapon in the Hadley residence. (*Id.* at 11, J.A. at 32.)

girlfriend and one to Mrs. Hadley. When asked how he was able to identify Defendant as one of the speakers on these recordings, Deputy Locke initially explained that he had spoken to Defendant for about 30 minutes at the jail without defense counsel being present.

At this point, Defendant lodged a number of objections to the admission of the recorded telephone conversations. First, Defendant argued that Deputy Locke's ability to identify his voice rested upon an impermissible interrogation outside the presence of his attorney, in violation of his Sixth Amendment right to counsel. Absent a proper basis for identifying him as the speaker, Defendant contended that any statements on the audiotapes should be excluded as inadmissible hearsay. Defendant also noted that the telephone call to his girlfriend was placed from the booking area of the jail, where callers are not warned that their conversations are being recorded.[2] As to this call, then, Defendant argued that the recording should be excluded as obtained in violation of his right to privacy. Following a recess, the district court sustained Defendant's objection to the admission of the recording of the call that originated from the booking area of the jail, without indicating which of Defendant's two arguments for exclusion had carried the day.

The Government was permitted, however, to introduce the recording of the telephone call to Mrs. Hadley from the housing area of the jail. As noted, inmates are warned that calls made from this location are being recorded. In addition, inmates are given an identification number for use in placing collect telephone calls, and calls made using this ID number include a recorded preamble identifying the inmate who originated the call. Deputy Locke testified that he relied in part on this identifying message to determine that Defendant had placed the call in question, and that he also relied upon his comparison of the voice in this recording to the voices in recordings of other calls made to Mrs. Hadley using Defendant's ID number. Following this testimony, the district court overruled Defendant's objection and admitted the recording, in which Defendant stated to Mrs. Hadley, "let the statement be that . . . I didn't have a gun," and that "if you go along with what the DA is saying, they gonna give me a life sentence." (Defendant/Appellant's Br. at 6.)[3]

After the Government rested its case and the district court denied Defendant's motion for a judgment of acquittal, Defendant called two witnesses who were present at his home on the night of the events giving rise to the felon-in-possession charge. First, Anthony Leak testified that he and the Hadleys' other guests had been eating on the patio of the Hadley residence when Defendant and Mrs. Hadley went into their bedroom and began to argue. Leak further testified that the bedroom door was open, and that he did not observe any weapons in the bedroom or any blows exchanged between the Hadleys. Another guest, Yvette, threatened to call the police because of the Hadleys' arguing, but Leak "asked her to let me see if I couldn't stop them from arguing before she called the law." (11/13/2002 Trial Tr. at 151, J.A. at 77.) When Leak failed to break up the argument, however, he told Yvette that "she could go ahead and call" the police. (*Id.* at 159, J.A. at 82.)

Defendant also introduced the testimony of his brother, Reginald Hadley, who testified that he, like Leak, was on the patio of the Hadley residence when he heard Defendant and Mrs. Hadley begin to argue. Reginald testified that the disagreement between his brother and Mrs. Hadley "wasn't loud at all," and that he did not observe any firearms during this incident. (*Id.* at 169, J.A. at 86.) According to Reginald, his brother did not own a firearm, but Mrs. Hadley did.

The defense then rested, and the parties stipulated that Defendant had previously been convicted of a felony offense. After deliberating for twenty-five minutes, the jury returned a guilty verdict on the felon-in-possession charge.

---

[2] In contrast, inmates are advised that the calls they make from the housing area of the jail are being recorded.

[3] Unfortunately, the parties neglected to include a transcript of this recording as part of the record on appeal.

## C.    Defendant's Sentencing Hearing

Defendant's sentencing hearing began on March 21, 2003, and was reconvened and concluded on June 6, 2003.  Defense counsel acknowledged that his client had three prior felony convictions, thereby triggering "armed career criminal" status under United States Sentencing Guideline ("U.S.S.G.") § 4B1.4. In light of this concession, the district court was left only to determine whether Defendant, in committing his felon-in-possession offense, had "used or possessed the firearm . . . in connection with . . . a crime of violence," U.S.S.G. § 4B1.4(b)(3)(A), a finding which would increase Defendant's offense level from 33 to 34.

In advocating this increase, the Government pointed to the evidence admitted at trial, including Mrs. Hadley's hearsay statements to the police that "he's got a gun" and "he's going to kill me."  In addition, the Government sought to introduce the handwritten statement provided by Mrs. Hadley on the night of the incident, in which she stated that "he held a gun to my head and said he was going to kill me."  Defense counsel objected that this statement was "inadmissible hearsay," but the district court ruled that it would "give this statement whatever weight the Court believes it deserves."  (3/21/2003 Sentencing Hearing Tr. at 13, J.A. at 96.)

Defendant then called Mrs. Hadley, who testified that her husband had never held a gun to her head — indeed, she denied that she had ever seen Defendant with a gun.  Mrs. Hadley further testified that, on the night in question, she did not run out of her house, but that the police instead came into the house.  When asked whether she told the police that night that Defendant had a gun, Mrs. Hadley testified that she could not recall what she had said because "[i]t happened so fast" and because of memory loss that she attributed to taking Prozac.  (*Id.* at 16-17, J.A. at 98-99.)

On cross-examination, Mrs. Hadley admitted that she had written the statement introduced by the Government at sentencing, in which she stated that Defendant "[h]eld a gun to my head" and "said he was going to kill me."  (*Id.* at 21, J.A. at 102.)  Mrs. Hadley also acknowledged her grand jury testimony that Defendant had placed a gun to her head, but she explained that she was "afraid" and "scared" during her grand jury appearance, and that she had merely "felt something" against her head that she "assumed" was a gun.  (*Id.* at 17-18, 22, J.A. at 99-100, 103.)[4]  Mrs. Hadley also complained that the Government had called her before the grand jury without advising her of her "right not to testify against my husband." (3/21/2003 Sentencing Hearing Tr. at 19, 22, J.A. at 101, 103.)

When the sentencing hearing resumed on June 6, 2003, Defendant was called to the witness stand. Defendant denied that had possessed a gun on the day of his arrest, or that he had pointed a gun at his wife's head.  More generally, he disclaimed any awareness that there was a gun in his home.  Defendant further testified that on the night of his arrest, he and his wife "did some arguing," Mrs. Hadley "got hysterical," and he told her "[y]ou're not going nowhere" and placed his hands against the door to prevent her from leaving the house.  (6/6/2003 Sentencing Hearing Tr. at 19, J.A. at 108.)  In Defendant's view, his wife produced a gun for the police officers only when it appeared that they were about to leave without arresting him.

Following Defendant's testimony, the district court took up the issue whether Defendant had committed a "crime of violence" during his felon-in-possession offense.  The court first observed that placing a gun to Mrs. Hadley's head would constitute an aggravated assault, which in turn would satisfy the definition of a "crime of violence" as set forth in the sentencing guidelines. The court further noted that the Government had the burden of proving by preponderance of the evidence that a crime of violence had occurred.

---

[4]Mrs. Hadley gave similar testimony at a September 3, 2002 detention hearing, stating that Defendant held something to her head that she "thought . . . was a gun," but that she was not certain about this.  (9/3/2002 Detention Hearing Tr. at 23, J.A. at 10.)

After hearing the arguments of counsel, the district court found that Defendant had possessed a firearm in connection with a crime of violence — namely, an aggravated assault on his wife. In so ruling, the court found that "[t]he defendant's wife, Mrs. Pattia Hadley, loves her husband, and she will do anything at all that she can, within reason, to help him and to prevent him from going to jail for a long time." (*Id.* at 75, J.A. at 113.) Accordingly, the court deemed it implausible that Mrs. Hadley would have lied to the police in order to secure her husband's arrest on the night in question. The court further observed that Mrs. Hadley "never said that she lied" during her testimony at sentencing, but merely that "she does not recall what happened." (*Id.* at 76, J.A. at 114.) In addition, the court found that Defendant "has a temper," as evidenced during the course of his testimony at sentencing. (*Id.* at 75, J.A. at 113.)

In light of this ruling, the district court adopted the increased offense level of 34 as recommended in Defendant's presentence report. Combined with Defendant's criminal history category of VI, the court computed a sentencing guideline range of 262 to 327 months. The district court then imposed a sentence at the bottom of this range, sentencing Defendant to a 262-month term of imprisonment. Defendant now appeals his conviction and sentence.

## III. *ANALYSIS*

Defendant has raised three issues in his brief on appeal: (i) whether the district court erred in admitting his wife's statements to the police on the night of his arrest as excited utterances; (ii) whether the admission at trial of a recording of a telephone call made by Defendant to his wife while incarcerated violated his Sixth Amendment right to counsel or his Fifth Amendment right to due process; and (iii) whether the district court erred at sentencing in determining that Defendant possessed a firearm in connection with a "crime of violence," triggering a one-level increase under U.S.S.G. § 4B1.4(b)(3)(A). In addition, the parties have been permitted to file supplemental briefs regarding the possible impact of the Supreme Court's recent decisions in *Blakely v. Washington,* 542 U.S. 296, 124 S. Ct. 2531 (2004), and *United States v. Booker,* __ U.S. __, 125 S. Ct. 738 (2005). We address each of these matters in turn.

A.    **Any Error in Admitting the Out-of-Court Statements of Defendant's Wife Does Not Warrant the Reversal of Defendant's Conviction.**

As his first issue on appeal, Defendant challenges the district court's determination that the statements made by his wife to the police on the night of his arrest were admissible as excited utterances under Fed. R. Evid. 803(2), regardless of whether he had any prior opportunity to cross-examine Mrs. Hadley concerning these statements, and regardless of whether Mrs. Hadley could have been called as a witness at trial. Since Defendant advanced this argument in his initial appellate brief, his evidentiary challenge has taken on a constitutional dimension in light of the Supreme Court's recent ruling in *Crawford v. Washington,* 541 U.S. 36, 124 S. Ct. 1354 (2004). Accordingly, we briefly discuss the broader impact of the *Crawford* decision, and then consider how this ruling bears upon the specific issue presented here.

1.    **The Impact of *Crawford* upon "Testimonial" Out-of-Court Statements**

All are agreed that the statements at issue in this case are "hearsay" as defined in the Federal Rules of Evidence — namely, "statement[s], other than one[s] made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). In particular, Defendant challenges the testimony of Officers Williams and Jenkins that his wife made certain statements to them upon their arrival at the Hadley residence on the night of his arrest. The declarant, Mrs. Hadley, was not called as a witness by either party, and thus did not make the challenged statements "while testifying at the trial." Moreover, whatever additional evidentiary purposes Mrs. Hadley's statements might have served, it is clear that the Government's principal objective in offering these statements was "to prove the truth of the matter asserted" — specifically, that Defendant "ha[d] a gun," in violation of the federal prohibition against the possession of firearms by convicted felons. Thus, the challenged testimony could

be admitted only if it fit within a hearsay exception, and the district court invoked the exception for "excited utterances," Fed. R. Evid. 803(2).

Prior to *Crawford,* this evidentiary ruling, if correct, would have satisfied both the rules of evidence and the dictates of the Sixth Amendment's Confrontation Clause. The latter, of course, guarantees the right of a criminal defendant "to be confronted with the witnesses against him." U.S. Const. amend. VI. Read broadly, the Confrontation Clause seemingly "could bar the use of any out-of-court statements when the declarant is unavailable," *Bourjaily v. United States,* 483 U.S. 171, 182, 107 S. Ct. 2775, 2782 (1987), as a defendant would lack the opportunity to confront the absent "witness" whose statement is being offered against him. In several decisions over the past few decades, however, the Supreme Court has rejected this reading of the Clause as "unintended and too extreme." *Ohio v. Roberts,* 448 U.S. 56, 63, 100 S. Ct. 2531, 2537 (1980). Instead, the Court has held that the Confrontation Clause bars the admission of only some, but not all, evidence "that would otherwise be admissible under an exception to the hearsay rule." *Idaho v. Wright,* 497 U.S. 805, 814, 110 S. Ct. 3139, 3146 (1990).

In particular, *Roberts* and its progeny adopted an approach that focused in significant part upon the reliability of the out-of-court statement. Apart from mandating a "rule of necessity," under which the prosecution often — but, as discussed below, not always — must "either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant," *Roberts* held that an out-of-court statement "is admissible only if it bears adequate 'indicia of reliability.'" *Roberts,* 448 U.S. at 65-66, 100 S. Ct. at 2538-39. The requisite degree of reliability, in turn, "can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception," or through some comparable form of "showing of particularized guarantees of trustworthiness." *Roberts,* 448 U.S. at 66, 100 S. Ct. at 2539.

In *White v. Illinois,* 502 U.S. 346, 349-51, 112 S. Ct. 736, 739-40 (1992), the Supreme Court applied the *Roberts* standard to the specific context of statements admitted under a state's hearsay exceptions for "spontaneous declarations" and "statements made in the course of securing medical treatment." The Court readily concluded, with little discussion, that "the two exceptions we consider in this case are 'firmly rooted,'" thereby satisfying the second prong of the *Roberts* test. *White,* 502 U.S. at 355 & n.8, 112 S. Ct. at 742 & n.8. The Court then held, in accordance with its prior ruling in *United States v. Inadi,* 475 U.S. 387, 106 S. Ct. 1121 (1986), that the showing of unavailability required under *Roberts* for the admission of statements made in prior judicial proceedings need not be "import[ed] . . . into the much different context of out-of-court declarations admitted under established exceptions to the hearsay rule." *White,* 502 U.S. at 358, 112 S. Ct. at 744.

Under this line of authority, then, the evidentiary inquiry required under Fed. R. Evid. 803(2) for admission of a statement as an "excited utterance" was entirely co-extensive with the demands of the Confrontation Clause as construed in *Roberts* and its progeny. As we observed not long ago, in a decision that pre-dated *Crawford,* "[i]f [a] statement qualifies as an excited utterance, which necessarily means that it carries sufficient indicia of reliability and trustworthiness, then the judicial inquiry is at an end." *United States v. Schreane,* 331 F.3d 548, 564 (6th Cir.), *cert. denied,* 540 U.S. 973 (2003). "The excited utterance exception, which is at least two centuries old and may in fact have its origins in late 17th century English common law, is without question a firmly rooted hearsay exception." *Schreane,* 331 F.3d at 564. Hence, an out-of-court statement that was properly admitted under this exception would not have run afoul of the Confrontation Clause, regardless of the availability of the declarant to testify at trial. As applied here, this rule would lead to the rejection of a Confrontation Clause challenge to the admission of Mrs. Hadley's statements to the police on the night of Defendant's arrest, so long as the district court permissibly found that these statements could be introduced into evidence as excited utterances.

*Crawford* dramatically alters this understanding of the interplay between the Confrontation Clause and the law of hearsay. In that case, the Supreme Court reviewed petitioner Michael Crawford's conviction in a Washington state court for assaulting a man who allegedly tried to rape Crawford's wife, Sylvia. At

trial, the state sought to introduce Sylvia's tape-recorded statement to the police, in which she gave an account of the incident that arguably undermined Crawford's claim that he had stabbed the victim in self-defense. Crawford objected that the admission of this statement would violate his rights under the Confrontation Clause, where his wife did not testify at trial because of a state marital privilege, and where he lacked any opportunity to cross-examine her about the statement. Applying the *Roberts* standard, the state trial court found that Sylvia's statement did not fall within a "firmly rooted hearsay exception," but that it nonetheless was admissible on the ground that it bore "particularized guarantees of trustworthiness."

The U.S. Supreme Court overturned Crawford's conviction, holding that the admission of Sylvia's statement violated his rights under the Confrontation Clause. In so ruling, the Court first surveyed the historical underpinnings of the Confrontation Clause, and found that "[t]his history supports two inferences about the meaning of" this constitutional provision. *Crawford,* 541 U.S. at 43-50, 124 S. Ct. at 1359-63. First, the Court determined that "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused." 541 U.S. at 50, 124 S. Ct. at 1363. Next, the Court found "that the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." 541 U.S. at 53-54, 124 S. Ct. at 1365.

Turning to its own Confrontation Clause precedents, the Court found that *Roberts* and its progeny, while perhaps correct in their outcomes, had applied a test that was not faithful to these overarching Sixth Amendment principles:

> *Roberts* conditions the admissibility of all hearsay evidence on whether it falls under a "firmly rooted hearsay exception" or bears "particularized guarantees of trustworthiness." This test departs from the historical principles identified above in two respects. First, it is too broad: It applies the same mode of analysis whether or not the hearsay consists of *ex parte* testimony. This often results in close constitutional scrutiny in cases that are far removed from the core concerns of the Clause. At the same time, however, the test is too narrow: It admits statements that *do* consist of *ex parte* testimony upon a mere finding of reliability. This malleable standard often fails to protect against paradigmatic confrontation violations.
>
> * * * *
>
> Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of "reliability" . . . . Admitting statements deemed reliable by a judge is fundamentally at odds with the right of confrontation. To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. The Clause thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined.
>
> * * * *
>
> Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty. This is not what the Sixth Amendment prescribes.

541 U.S. at 60-62, 124 S. Ct. at 1369-71 (citations omitted).

Accordingly, the *Crawford* Court overruled *Roberts* as to "testimonial evidence," holding that "the Sixth Amendment demands what the common law required:  unavailability and a prior opportunity for cross-examination."  541 U.S. at 68, 124 S. Ct. at 1374.  "Where nontestimonial hearsay is at issue," in contrast, the Court found it "wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law — as does *Roberts,* and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether."  541 U.S. at 68, 124 S. Ct. at 1374.[5]

As discussed below, the Court "le[ft] for another day any effort to spell out a comprehensive definition of 'testimonial.'" 541 U.S. at 68, 124 S. Ct. at 1374.  The Court observed, however, that this term "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations."  541 U.S. at 68, 124 S. Ct. at 1374.  Thus, the Court readily concluded that the tape-recorded statement at issue in that case was testimonial "under any definition," where Crawford's wife made her statement "[i]n response to often leading questions from police detectives" and "while in police custody, herself a potential suspect in the case," and where "she implicated her husband in [the victim's] stabbing and at least arguably undermined his self-defense claim."  541 U.S. at 61, 65, 124 S. Ct. at 1370, 1372.

In the wake of *Crawford,* then, it can no longer be said that "the judicial inquiry is at an end," *Schreane,* 331 F.3d at 564, so long as an out-of-court statement qualifies as an excited utterance or falls within some other "firmly rooted" hearsay exception.  Here, if we hold that the district court properly admitted the out-of-court statements of Defendant's wife as excited utterances, there would remain the further question whether these statements were "testimonial."  If so, they could not have been properly admitted at trial absent Mrs. Hadley's unavailability as a witness and a prior opportunity to cross-examine her.  Accordingly, we turn first to the evidentiary issue, and then address the constitutional question as necessary to the resolution of this case.

       2.       **The District Court Did Not Abuse Its Discretion in Determining that Mrs. Hadley's Statements Qualified as Excited Utterances.**

The out-of-court statements at issue here were made by Defendant's wife to the police upon their arrival at the Hadley residence in response to a 911 call reporting an assault in progress or a domestic disturbance. Defense counsel objected that these statements were inadmissible hearsay, but the Government countered that Mrs. Hadley's statements fell within the hearsay exception for excited utterances, Fed. R. Evid. 803(2). The district court overruled Defendant's objection and allowed the statements into evidence, without elaboration or further inquiry as to whether they met all of the conditions for admission as excited utterances.  We review this evidentiary ruling for an abuse of discretion, and will not disturb it absent a "definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *Schreane,* 331 F.3d at 564 (internal quotation marks and citations omitted).

Under the pertinent federal evidentiary rule, an excited utterance is defined as a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Fed. R. Evid. 803(2).  We apply a three-factor test for determining whether a statement qualifies as an excited utterance. *See Schreane,* 331 F.3d at 564; *Haggins v. Warden, Fort Pillow State Farm,* 715 F.2d 1050, 1057 (6th Cir. 1983), *cert. denied,* 464 U.S. 1071 (1984).  "First, there must be an event startling enough to cause nervous excitement." *Haggins,* 715 F.2d at 1057.  "Second, the statement must be made before there is time to contrive or misrepresent." 715 F.2d at 1057.  Finally, "the statement must be made while the person is under the stress of the excitement caused by the event." 715 F.2d at 1057. More generally, we ask whether the statements at issue were made "under circumstances *that eliminate the*

---

[5]While acknowledging that some had urged the rejection of *Roberts* as to testimonial and nontestimonial statements alike, the Court declined to "definitively resolve" whether *Roberts* remains controlling in the latter context, or whether nontestimonial hearsay should instead be governed exclusively by the law of evidence.  541 U.S. at 60-61, 124 S. Ct. at 1369-70.

*possibility of fabrication, coaching, or confabulation,* and that therefore the circumstances surrounding the making of the statement provide sufficient assurance that the statement is trustworthy and that cross-examination would be superfluous." *Schreane,* 331 F.3d at 563 (internal quotation marks and citation omitted) (emphasis in original).

Under these standards, we cannot say that the district court abused its discretion in admitting Mrs. Hadley's statements as excited utterances. First, there is ample evidence of a startling event that could have been expected to cause nervous excitement. Officer Williams testified that he received a 911 dispatch advising of an assault in progress at the Hadley residence. He also was told that the 911 call was on an "open line," so that the operator was able to hear the incident in progress over the telephone and confirm an ongoing altercation.[6] In just the few minutes it took Officer Williams to reach the home after receiving this dispatch, he was told that a second 911 call had been placed urging the police to hurry. Similarly, Officer Jenkins testified that she received a "Priority 1" 911 dispatch for a "domestic disturbance with a gun" at the Hadley residence. We have no difficulty in concluding that an ongoing domestic dispute that warranted two 911 calls within a short time from one of the Hadleys' guests constituted a "startling event" that would have generated nervous excitement in anyone on the premises at the time, and particularly in one of the two principal disputants.

Nor, contrary to Defendant's assertion, was it necessary for the district court to engage in impermissible "bootstrapping" in order to reach this conclusion. In Defendant's view, the proof of a startling event rests too heavily upon Mrs. Hadley's own statements that "he has a gun" and "he's going to kill me." Yet, with or without the involvement of a weapon or threats of lethal violence, we are confident that a domestic disturbance can qualify as startling event, particularly if it warrants two 911 calls in close succession seeking police intervention. The evidence of these calls, of course, was wholly independent of and antecedent to Mrs. Hadley's statements upon the officers' arrival at her home. Indeed, even Defendant's own witnesses, Anthony Leak and Reginald Hadley, confirmed that Defendant and his wife were arguing, and Leak testified that he was unsuccessful in his efforts to restore order to the household and to dissuade another guest, Yvette, from calling 911. Although Defendant's witnesses sought to downplay the contentiousness of the dispute, the record as a whole provides ample support for a finding of a startling event that could cause nervous excitement and precipitate an excited utterance. *See Schreane,* 331 F.3d at 564 (finding that a "verbal altercation" between the defendant and his nephew "qualifies as a startling event").[7]

Defendant's arguments on the remaining two prongs of the excited utterance test warrant little discussion. In particular, Defendant is simply wrong to contend that "there is no proof" as to the time that lapsed between any startling event and Mrs. Hadley's statements to the police. (Defendant/Appellant's Br. at 16.) Although this might be true if the startling event in question were the brandishing of a weapon, we already have explained that this view of the record unduly discounts the significance of the domestic dispute between Defendant and his wife. Considered in this broader context, the record reveals that only about two minutes passed between the 911 dispatcher's report to Officer Williams of a assault in progress and the officer's arrival at Defendant's home, with the dispatcher advising Officer Williams that an ongoing altercation could be heard over the phone line and that a second 911 call had been received while he was in transit. Similarly, Officer Jenkins testified that she received and responded to an urgent "priority 1" call of a domestic disturbance with a gun at the Hadley residence.

---

[6] Officer Williams testified that the dispatcher "could hear people screaming and someone saying stop hitting another person." (11/12/2002 Trial Tr. at 6, J.A. at 28.) Although the district court sustained Defendant's objection to this testimony as hearsay, the court itself was entitled to consider this testimony in determining whether Mrs. Hadley's subsequent statements to the officers were admissible as excited utterances. *See* Fed. R. Evid. 104(a); *Bourjaily,* 483 U.S. at 177-78, 107 S. Ct. at 2780.

[7] In light of this conclusion, it is unnecessary to address Defendant's contention that a startling event cannot be established solely by resort to an excited utterance itself, but instead must be corroborated with independent evidence.

When Officers Williams and Jenkins arrived at Defendant's home, both reported that they immediately observed Mrs. Hadley run out of the front door, appearing "hysterical," "in a state of panic," "crying," "shaking," and "weeping." (11/12/2002 Trial Tr. at 7, 28-30, J.A. at 29, 41-43.)  Both officers further testified that Mrs. Hadley promptly and without solicitation made the statements now challenged by Defendant, before either officer had commenced any sort of questioning.  We readily conclude that this record satisfies the second and third elements of the excited utterance standard — namely, that the statements be "made before there is time to contrive or misrepresent" and "while the person is under the stress of the excitement caused by the event." *Haggins,* 715 F.2d at 1057.

Finally, and more generally, Defendant suggests that his wife's statements lack the "inherent guarantees of truthfulness" that typically accompany statements admitted under the hearsay exception for excited utterances, *Haggins,* 715 F.2d at 1057, where Mrs. Hadley subsequently denied in her testimony at sentencing that she had observed Defendant with a weapon on the night of his arrest.  Yet, as we have previously explained, a statement that satisfies all of the elements of our test for excited utterances meets the threshold for admissibility under Rule 803(2), even though its reliability might be subject to challenge on such grounds as inconsistency with subsequent statements or the speaker's motive to fabricate.  *See Schreane,* 331 F.3d at 563.  The decision cited by Defendant, *United States v. Winters,* 33 F.3d 720, 722-23 (6th Cir. 1994), *cert. denied,* 513 U.S. 1172 (1995), is not to the contrary, where the challenged statements in that case were made two days after the triggering event and the district court found that they "were the product of conscious reflection," thereby defeating any appeal to the excited utterance exception.

Here, by contrast, the record is sufficient to sustain the district court's application of this hearsay exception to admit Mrs. Hadley's statements to the police on the night of her husband's arrest.  Any challenges to the reliability of these statements would go to their weight rather than their admissibility — the jury was certainly entitled, for example, to credit the testimony of the defense witnesses that they did not see Defendant with a gun that evening.  On the threshold question of admissibility, however, we discern no clear error or abuse of discretion in the district court's decision to admit Mrs. Hadley's statements as excited utterances.

### 3.        The District Court Did Not Commit Plain Error by Allowing Mrs. Hadley's Out-of-Court Statements into Evidence Without Insisting that She Be Called as a Witness.

Having affirmed the district court's evidentiary ruling that Mrs. Hadley's statements were admissible as excited utterances, we now must consider whether these statements nonetheless should have been excluded under the Confrontation Clause as construed in *Crawford.*  Because Defendant raised only a hearsay objection to these statements at trial, and did not challenge their admissibility on constitutional grounds, our review here is governed by the plain error standard.  *See United States v. Cromer,* 389 F.3d 662, 672 (6th Cir. 2004).  Under this standard, we may correct a purported error that was not raised at trial only if there is "(1) error, (2) that is plain, and (3) that affect[s] substantial rights." *Johnson v. United States,* 520 U.S. 461, 467, 117 S. Ct. 1544, 1549 (1997) (internal quotation marks and citation omitted).  "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Johnson,* 520 U.S. at 467, 117 S. Ct. at 1549 (internal quotation marks and citations omitted).[8]

---

[8] We recognize that, at the time of trial in this case, the district court was bound by existing precedent that conflated the two inquiries whether an out-of-court statement was admissible under the hearsay exception for excited utterances and whether the statement was admissible over a Confrontation Clause challenge.  *See White,* 502 U.S. at 355-58, 112 S. Ct. at 742-44; *Schreane,* 331 F.3d at 564-65.  Thus, Defendant arguably had little incentive to raise a separate Confrontation Clause objection to the admission of his wife's out-of-court statements, since the outcome of any such constitutional inquiry would have been dictated by the district court's evidentiary ruling that these statements qualified as excited utterances.

Nonetheless, the law is clear that the plain error standard applies in these circumstances, understandable though it might be that a defendant failed to raise a "virtually useless . . . objection[]" to a "ruling[] that w[as] plainly supported by existing precedent" at the time of trial. *Johnson,* 520 U.S. at 468, 117 S. Ct. at 1549; *see also United States v. Milan,* 398 F.3d 445, 451

### a.      The Definition of "Testimonial" Statements as Developed in *Crawford* and This Circuit's Subsequent Decisions

As noted earlier, the rule of *Crawford* applies here only if Mrs. Hadley's statements were "testimonial."[9] If so, it would have been error to admit her statements at Defendant's trial unless she was unavailable and Defendant had a prior opportunity to cross-examine her. *See Crawford,* 541 U.S. at 59, 124 S. Ct. at 1369.[10] *Crawford* itself provides some guidance in this inquiry, as does one of this circuit's post-*Crawford* decisions.

*Crawford* declines to "spell out a comprehensive definition of 'testimonial,'" despite the Court's recognition that this "refusal . . . will cause interim uncertainty." 541 U.S. at 68 & n.10, 124 S. Ct. at 1374 & n.10. Instead, the Court merely noted three possible formulations of the "core class of 'testimonial' statements" reached by the Confrontation Clause: (i) "*ex parte* in-court testimony or its functional equivalent — that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," (ii) "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," and (iii) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." 541 U.S. at 51-52, 124 S. Ct. at 1364 (internal quotation marks and citations omitted). As the Court observed, "[t]hese formulations all share a common nucleus and then define the Clause's coverage at various levels of abstraction around it." 541 U.S. at 52, 124 S. Ct. at 1364.

In the wake of this Supreme Court ruling, a panel of this court adopted the formulation of "testimonial" statements advocated by Professor Richard Friedman of the University of Michigan Law School: namely, that a statement is "testimonial" if "made in circumstances in which a reasonable person would realize that it likely would be used in investigation or prosecution of a crime." *Cromer,* 389 F.3d at 673-74 (internal quotation marks and citation omitted).[11] The evidence at issue in *Cromer* was a police officer's testimony concerning information supplied to her by a confidential informant who was not called as a witness at trial. Specifically, the confidential informant had provided information indicating that drug sales had been made from a particular residence, and that an individual arguably matching the defendant's physical description had been involved in these drug transactions. The officer briefly referenced some of this information during the prosecutor's direct examination, provided additional details during cross-examination by defense counsel and the defendant himself, and then returned to this subject on redirect.

---

(6th Cir. 2005) (applying plain error review to a Sixth Amendment challenge raised for the first time on appeal in the wake of the *Booker* decision); *United States v. King,* 272 F.3d 366, 374 (6th Cir. 2001), *cert. denied,* 535 U.S. 1119 (2002). Although we do not demand utter precision in a defendant's presentation of the grounds for an objection, *see United States v. Zidell,* 323 F.3d 412, 427 & n.5 (6th Cir.), *cert. denied,* 540 U.S. 824 (2003), the issue must be raised in a manner that enables the district court to discern its constitutional dimension, *see United States v. Davis,* 397 F.3d 340, 350 (6th Cir. 2005). Here, the trial record is bereft of any mention of the Confrontation Clause or the Sixth Amendment, nor does it appear more generally that Defendant complained of a lack of opportunity to cross-examine Mrs. Hadley regarding her out-of-court statements. Accordingly, we are limited to plain error review of this forfeited objection.

[9] In addition, the statements must have been offered for the truth of the matters asserted in them. *See Crawford,* 541 U.S. at 59 n.9, 124 S. Ct. at 1369 n.9. Here, the Government did not contend at trial that Mrs. Hadley's statements were admissible for some non-hearsay purpose, but instead argued only that the statements should be admitted under the hearsay exception for excited utterances.

[10] Alternatively, if Mrs. Hadley could have been made to appear as a witness at her husband's trial — a subject discussed below — her prior out-of-court statements would have been admissible against a Confrontation Clause challenge, *see Crawford,* 541 U.S. at 59 n.9, 124 S. Ct. at 1369 n.9, so long as there was some evidentiary basis for admitting them, *see, e.g.,* Fed. R. Evid. 801(d).

[11] This formulation is essentially identical to the third (and broadest) definition of "testimonial" statements cited by the Supreme Court in *Crawford.*

The panel in *Cromer* readily concluded that a confidential informant's statements to the police qualify as "testimonial" within the definition adopted in that case:

> Tips provided by confidential informants are knowingly and purposely made to authorities, accuse someone of a crime, and often are used against the accused at trial. The very fact that the informant is confidential — *i.e.,* that not even his identity is disclosed to the defendant — heightens the dangers involved in allowing a declarant to bear testimony without confrontation. The allowance of anonymous accusations of crime without any opportunity for cross-examination would make a mockery of the Confrontation Clause.

389 F.3d at 675 (citation omitted).[12]

The court then held that the officer's testimony in that case was admissible to the extent that it merely "alluded to" the confidential informant's out-of-court statements for the background purposes of "explaining how certain events came to pass or why the officers took the actions they did" in searching the residence identified by the informant. *Cromer,* 389 F.3d at 676. In contrast, the court found that the officer's testimony ran afoul of the Confrontation Clause to the extent that it conveyed information from the informant that implicated the defendant in criminal activity, as such out-of-court statements "went to the very heart of the prosecutor's case" and were impermissibly "offered for the truth of the matter[s] asserted." 389 F.3d at 676-78 (internal quotation marks and citation omitted).[13]

---

[12]In light of this reasoning, it arguably was not necessary for the panel in *Cromer* to settle upon a single, definitive formulation of "testimonial" statements that would govern each and every subsequent case in this circuit. For the very reasons identified by the court, a confidential informant's tip to the authorities seemingly would satisfy at least two, and perhaps all three, of the definitions cited in *Crawford.*

Indeed, such tips are similar in many respects to statements made to the police in the course of interrogation, which *Crawford* holds are "testimonial under even a narrow standard." *Crawford,* 541 U.S. at 52, 124 S. Ct. at 1364. The only apparent distinction is that an informant's tip might be "volunteered" rather than "elicited through formalized police interrogation," *Cromer,* 389 F.3d at 675 — although, as a matter of brute fact, the courts generally are not privy to the circumstances surrounding a confidential informant's disclosure to the authorities. In any event, *Cromer* rejects any bright-line distinction between volunteered statements and those elicited through interrogation, observing that an individual who "bears a grudge" against the accused, for example, would likely be only too happy to "volunteer to police, truthfully or not, information of the commission of a crime, especially when that person is assured he will not be subject to confrontation." *Cromer,* 389 F.3d at 675.

[13]Arguably, the same outcome could have been reached under ordinary hearsay principles, without even reaching the constitutional issue or addressing the impact of *Crawford.* A number of pre-*Crawford* decisions, in this circuit and elsewhere, have recognized the danger of allowing an informant's out-of-court statements about a defendant's involvement in criminal activity to be put before the jury as part of a testifying officer's explanation of "why an investigation proceeded as it did." *United States v. Fountain,* 2 F.3d 656, 668-69 (6th Cir.), *cert. denied,* 510 U.S. 1014 (1993); *see also United States v. Martin,* 897 F.2d 1368, 1371-72 (6th Cir. 1990); *United States v. Evans,* 216 F.3d 80, 85-87 (D.C. Cir.), *cert. denied,* 531 U.S. 971 (2000); *United States v. Williams,* 133 F.3d 1048, 1051-52 (7th Cir. 1998); *United States v. Lovelace,* 123 F.3d 650, 652-53 (7th Cir. 1997), *cert. denied,* 522 U.S. 1132 (1998); *United States v. Reyes,* 18 F.3d 65, 69-71 (2d Cir. 1994). Indeed, *Cromer* explicitly cites the *Fountain* and *Martin* decisions in support of its ruling. *See Cromer,* 389 F.3d at 676-77.

### b. Mrs. Hadley's Statements Were Not "Testimonial."

Against this backdrop of *Crawford* and *Cromer,* I return to the question whether Mrs. Hadley's statements in this case were "testimonial."[14] Although *Crawford* itself addressed a different sort of out-of-court statement — namely, statements made in response to police interrogation — the Court's analysis and observations inform my inquiry here. First, *Crawford* holds that "interrogations by law enforcement officers fall squarely within" the class of "testimonial hearsay" that is the "primary object" of the Confrontation Clause. *Crawford*, 541 U.S. at 53, 124 S. Ct. at 1365. The Court explained that "[w]e use the term 'interrogation' in its colloquial, rather than any technical legal, sense," and that a statement "knowingly given in response to structured police questioning . . . qualifies under any conceivable definition" as the product of "interrogation." 541 U.S. at 53 n.4, 124 S. Ct. at 1365 n.4. Similarly, the Court observed that "the Framers were keenly familiar" with the "unique potential for prosecutorial abuse" when government officers are involved "in the production of testimony with an eye toward trial," and that the modern practice of police interrogation has a "close[] kinship to the abuses at which the Confrontation Clause was directed." 541 U.S. at 56 n.7, 68, 124 S. Ct. at 1367 n.7, 1374.

Whatever else might be said about whether Mrs. Hadley's statements were "testimonial," it is at least clear that they were not the product of police interrogation, and thus do not fall within the category that *Crawford* identifies as one of the core concerns of the Confrontation Clause. According to the uniform testimony of Officers Williams and Jenkins, Mrs. Hadley volunteered the statements that "he has a gun" and "he's going to kill me" as she ran out of her home upon the officers' arrival, and before they could even begin to question her about the evening's events. Initially, at least, the officers did nothing to elicit any "testimonial" statements from Mrs. Hadley about her husband's activities that night.[15]

Nor can it be said that the officers arrived at the Hadleys' residence with the intention or expectation that they would be conducting an "interrogation." At that point, they knew only that a 911 call had been placed from the home reporting an assault in progress or domestic disturbance. With this limited information, even if the officers had initiated the interaction with Mrs. Hadley, rather than vice versa, they could hardly be viewed as engaged in "structured police questioning" directed at "the production of testimony with an eye toward trial." Rather, the officers' concern, at least initially, would have been to ascertain the nature of the assault or domestic disturbance reported by the 911 dispatcher. *See United States v. Rohrig,* 98 F.3d 1506, 1521, 1523 (6th Cir. 1996) (noting that police officers are not invariably engaged

---

[14] My colleagues on the panel elect not to reach this issue. Instead, they would assume, without deciding, that the challenged statements run afoul of *Crawford,* and then proceed directly to the remaining prongs of the "plain error" analysis (upon which we all are in agreement). To the extent that this approach rests upon notions of "constitutional avoidance" or more general concerns of overreaching, I wholeheartedly agree that courts should not unnecessarily address constitutional issues or otherwise overreach, but respectfully disagree that any such principles of judicial restraint are implicated here. Rather, having failed to resolve Defendant's challenge on evidentiary grounds, we necessarily are led to the *Crawford* issue. So long as the record is sufficiently developed to permit a meaningful inquiry — as it is here, in my judgment — our application of *Crawford* to this case would aid in the development of an emerging body of law under a general fact pattern which, as noted below, has arisen in one form or another in many post-*Crawford* state and federal decisions. In declining to adopt a single, definitive standard for determining whether a statement is "testimonial," the *Crawford* Court presumably anticipated that the lower courts would embark upon exactly this sort of case-by-case exposition of the law.

In addition, it strikes me as analytically dissatisfying to avoid any discussion about whether or how the district court might have erred, but then to conclude that any such error, whatever it might have been, was insufficiently egregious to warrant correction under the "plain error" standard. For my part, only after careful consideration of the *Crawford* issue am I able to say with confidence that the challenged district court rulings could not be characterized as plainly erroneous. And, for what it is worth, my survey of the pertinent Supreme Court precedents has failed to disclose a single instance in which the Court skipped past the first prong of "plain error" review and asked only whether a posited error satisfied the remaining prongs of this standard.

[15] Matters might well be different as to the written statement Mrs. Hadley gave to the police after Defendant had been taken into custody and placed in a squad car. This issue is not before us, however, because the district court sustained Defendant's objection to the admission of this statement at trial. The *Crawford* analysis here, therefore, is limited to the verbal statements Mrs. Hadley made to Officers Williams and Jenkins upon their arrival at her home.

in the investigation of criminal activity, but often perform community caretaking functions). I readily conclude, then, that Mrs. Hadley's statements do not lie within the class of "[s]tatements taken by police officers in the course of interrogations" that *Crawford* holds are "testimonial under even a narrow standard." *Crawford,* 541 U.S. at 52, 124 S. Ct. at 1364.

While *Cromer* applies a somewhat broader standard, my conclusion remains the same. Under *Cromer*'s definition of "testimonial," a court must ask whether a statement was "made in circumstances in which a reasonable person would realize that it likely would be used in investigation or prosecution of a crime." *Cromer,* 389 F.3d at 673 (internal quotation marks and citation omitted). Thus, considering the circumstances in which Mrs. Hadley made her statements to the police, the question here is whether a reasonable person in her situation would realize that his or her statements likely would be used in a subsequent criminal investigation or trial.

In my view, the environment in which Mrs. Hadley made her statements was antithetical to any calculated, dispassionate reflection about the possible use of these statements in a criminal investigation or prosecution. In the few minutes before Mrs. Hadley made her statements to Officers Williams and Jenkins, a guest had placed two 911 calls from her residence in close succession, stating that an assault or domestic disturbance was in progress and urging the police to hurry. In addition, the dispatcher reported to Officer Williams that the sounds of an ongoing disturbance could be heard in the background of at least one of these calls. The ongoing, or at least very recent, nature of this disturbance is further confirmed by the officers' testimony that Mrs. Hadley appeared "hysterical" and "in a state of panic" when she emerged from her house and made the challenged statements. It is highly unlikely, in my view, that a reasonable person in this situation would be capable of reflecting upon the prospect that his or her statements might be used in some future criminal proceeding. Rather, the declarant's paramount (if not sole) interest or concern at this point surely would be to secure immediate police assistance and intervention in a dangerous situation that posed an imminent threat to her own safety and well-being.

A number of other considerations confirm my view that Mrs. Hadley did not intend to provide "testimony" that could be used in a subsequent criminal proceeding against her husband. First, I note the absence of any evidence that Mrs. Hadley herself sought police intervention in the dispute with her husband. The 911 calls were placed by a household guest, not Mrs. Hadley, and nothing in the record suggests that she requested that the authorities be summoned, or that she was even aware that such a call had been made. To the contrary, the testimony of defense witness Anthony Leak indicates that he and another guest debated whether to call the police while the Hadleys were arguing in their bedroom, and that the call was made only after Leak failed to break up the dispute.

Moreover, the record lacks any indicia of mixed motives behind Mrs. Hadley's statements to the police. She did not, for example, provide any gratuitous information about her husband's activities, background, or possible criminal wrongdoing, but merely addressed an immediate threat to her safety. Nor, as noted earlier, did the police officers conduct themselves in a way that might have alerted someone in Mrs. Hadley's position that she was being "interrogated" for information that might precipitate or advance a criminal investigation. Under these circumstances, I cannot say that a reasonable person in Mrs. Hadley's position would have realized that his or her statements were likely to be used in a subsequent criminal proceeding.

My conclusion on this point comports with the substantial weight of the post-*Crawford* case law on this subject. The Eighth Circuit has broadly held, for example, that statements that qualify as excited utterances are not "testimonial" under *Crawford*. *See United States v. Brun,* 416 F.3d 703, 707-08 (8th Cir. 2005). The statements at issue in *Brun* were made during 911 calls from the home of defendant Donald James Brun and his girlfriend, Nicole Oakgrove, and then upon the arrival of the police in response to the 911 calls. In the 911 calls, Oakgrove and her nephew told the dispatcher that Brun and Oakgrove were arguing, that Brun was drunk and in possession of a rifle, and that Brun had fired this weapon into the bathroom of the home. When the police arrived a few minutes later, Oakgrove stated that Brun had come

home drunk, that the couple had begun to fight, that Brun had fired a rifle in the bathroom while she was in it, and that Brun also had fired the rifle a couple more times outside the residence before driving off in Oakgrove's pickup truck. In Brun's subsequent trial for assault with a dangerous weapon, the district court admitted all of these statements as excited utterances, and the Eighth Circuit upheld these rulings against a *Crawford* challenge, reasoning that the statements were "emotional and spontaneous rather than deliberate and calculated," and that they were "not made in response to suggestive questioning." *Brun,* 416 F.3d at 707.

The Second and Ninth Circuits also have suggested, albeit only in dicta, that statements made by a victim to the police in the immediate aftermath of an emergency situation would not qualify as "testimonial" under *Crawford. See Mungo v. Duncan,* 393 F.3d 327, 336 n.9 (2d Cir. 2004), *cert. denied,* 125 S. Ct. 1936 (2005); *Leavitt v. Arave,* 383 F.3d 809, 830 n.22 (9th Cir. 2004), *cert. denied,* 125 S. Ct. 2540 (2005). In *Mungo,* 393 F.3d at 329-30, two police officers on patrol heard gunshots and were flagged down by the victim, who responded affirmatively when asked by the officers whether two men running from the scene were the shooters. The Second Circuit held that *Crawford* did not apply retroactively on collateral review of a state court conviction, but expressed its doubt that responses "delivered in emergency circumstances to help the police nab [the victim's] assailants . . . were the type of declarations the [Supreme] Court would regard as testimonial." 393 F.3d at 336 & n.9.

Similarly, in *Leavitt,* 383 F.3d at 814, 830 (footnotes omitted), a murder victim had called 911 the night before her death, stating "in a great state of agitation" that a prowler was trying to enter her home, and expressing her belief that the prowler was petitioner Richard Leavitt "because he had tried to talk himself into her home earlier that day." The Ninth Circuit declined to decide whether *Crawford* applied retroactively to Leavitt's collateral attack on his state court murder conviction, explaining that "[a]lthough the question is close, we do not believe that [the victim's] statements are of the kind with which *Crawford* was concerned, namely, testimonial statements." 383 F.3d at 830 n.22. In support of this conclusion, the court reasoned that the victim, "not the police, initiated their interaction" by calling 911, and that the victim "was in no way being interrogated by [the police] but instead sought their help in ending a frightening intrusion into her home." 383 F.3d at 830 n.22.

Most recently, the First Circuit advanced a more nuanced view of excited utterances that I regard as similar to my own approach in this case. In *United States v. Brito,* 427 F.3d 53, 59-63 (1st Cir. 2005), the court considered the admissibility of an anonymous 911 call providing the description of a man with a gun outside a saloon. Based on this description, the police took defendant Jean Brito into custody, and he subsequently was charged with a federal felon-in-possession offense. During a trial that pre-dated *Crawford,* the district court allowed the government to introduce the anonymous 911 call as an excited utterance, and the First Circuit held on appeal that the call was properly admitted as "both an excited utterance and nontestimonial in nature." *Brito,* 427 F.3d at 63.

In so ruling, the First Circuit rejected any sort of categorical rule that would classify excited utterances as either testimonial or non-testimonial. Instead, the court "conclude[d] that the excited utterance and testimonial hearsay inquiries are separate, but related." *Brito,* 427 F.3d at 61. The court explained:

> While both inquiries look to the surrounding circumstances to make determinations about the declarant's mindset at the time of the statement, their focal points are different. The excited utterance inquiry focuses on whether the declarant was under the stress of a startling event. The testimonial hearsay inquiry focuses on whether a reasonable declarant, similarly situated (that is, excited by the stress of a startling event), would have had the capacity to appreciate the legal ramifications of her statement.
>
> These parallel inquiries require an ad hoc, case-by-case approach. An inquiring court first should determine whether a particular hearsay statement qualifies as an excited utterance. If not, the inquiry ends. If, however, the statement so qualifies, the court then

must look to the attendant circumstances and assess the likelihood that a reasonable person would have either retained or regained the capacity to make a testimonial statement at the time of the utterance.

427 F.3d at 61-62 (footnote omitted). The court also offered some "general guidance" in applying this rule, observing that "[o]rdinarily, statements made to the police while the declarant or others are still in personal danger cannot be said to have been made with consideration of their legal ramifications." 427 F.3d at 62. The court then concluded that the 911 call at issue fell within this general rule, as the anonymous caller's statements "that she had 'just' heard gunshots and seen a man with a gun, that the man had pointed the gun at her, and that the man was still in her line of sight" all "strongly suggest[ed]" that she was "in imminent personal peril when the call was made." 427 F.3d at 62.

Beyond these federal appellate decisions, a number of state courts have considered whether statements made to the police during 911 calls or immediately upon their arrival at the scene of an ongoing or recent crime or emergency were testimonial, with most concluding that they were not. *See, e.g., Anderson v. State,* 111 P.3d 350, 353-56 (Alaska Ct. App. 2005); *People v. Corella,* 18 Cal. Rptr.3d 770, 776 (Cal. Ct. App. 2004); *Pitts v. State,* 612 S.E.2d 1, 5 (Ga. Ct. App. 2005); *People v. West,* 823 N.E.2d 82, 88-92 (Ill. App. Ct. 2005); *Hammon v. State,* 829 N.E.2d 444, 456-58 (Ind. 2005); *State v. Barnes,* 854 A.2d 208, 211-12 (Me. 2004); *People v. Walker,* 697 N.W.2d 159, 163-66 (Mich. Ct. App.), *lv. app. granted,* 697 N.W.2d 527 (Mich. 2005); *State v. Wright,* 701 N.W.2d 802, 811-14 (Minn. 2005); *State v. Hembertt,* 696 N.W.2d 473, 482-84 (Neb. 2005); *People v. Mackey,* 785 N.Y.S.2d 870, 872-74 (N.Y. Crim. Ct. 2004); *People v. Moscat,* 777 N.Y.S.2d 875, 879-80 (N.Y. Crim. Ct. 2004); *State v. Forrest,* 596 S.E.2d 22, 26-27 (N.C. Ct. App. 2004), *aff'd,* 611 S.E.2d 833 (N.C. 2005); *State v. Davis,* 111 P.3d 844, 849-51 (Wash. 2005). *But see, e.g., Lopez v. State,* 888 So.2d 693, 698-700 (Fla. Dist. Ct. App. 2004); *People v. Cortes,* 781 N.Y.S.2d 401, 404-07, 415-16 (N.Y. Sup. Ct. 2004); *State v. Powers,* 99 P.3d 1262, 1264-66 (Wash. Ct. App. 2004).[16]

As a general matter, the cases holding that such statements were not testimonial have cited the same factors I have relied upon here, including (i) an ongoing or very recently abated threat faced by the declarant, *see, e.g., Pitts,* 612 S.E.2d at 4; *West,* 823 N.E.2d at 88-91; *Wright,* 701 N.W.2d at 811, 813; *Hembertt,* 696 N.W.2d at 483-84; *Moscat,* 777 N.Y.S.2d at 879-80; *Forrest,* 596 S.E.2d at 27; *Davis,* 111 P.3d at 850-51; (ii) the declarant's initiation of contact with the police, and not vice versa, *see, e.g., Corella,* 18 Cal. Rptr.3d at 776; *Pitts,* 612 S.E.2d at 4; *Barnes,* 854 A.2d at 211; *Moscat,* 777 N.Y.S.2d at 879; *Forrest,* 596 S.E.2d at 27; (iii) the volunteering of information to the police, as opposed to a statement elicited through interrogation or structured questioning, *see, e.g., Forrest,* 596 S.E.2d at 27; and (iv) the nature of the information provided, reflecting a need for immediate aid rather than an intent to precipitate or assist in a criminal investigation or prosecution, *see, e.g., West,* 823 N.E.2d at 89, 91; *Hammon,* 829 N.E.2d at 458; *Barnes,* 854 A.2d at 211; *Wright,* 701 N.W.2d at 813-14. The decisions reaching a different result, in contrast, typically feature distinguishable facts and circumstances, such as directed questioning by a 911 operator, *see Cortes,* 781 N.Y.S.2d at 404-07, or a statement which conveys information outside the scope of the declarant's need for immediate aid, *see Powers,* 99 P.3d at 1266.

Upon thorough review of both *Crawford* and these subsequent rulings, I conclude that the result I would reach here is fully consonant with this emerging body of law. As explained, the statements at issue in this case were made within only a few short minutes after Defendant and Mrs. Hadley had engaged in a domestic dispute serious enough to warrant two 911 calls by their household guests. The resulting police intervention was initiated by someone within the Hadley residence, and not by the authorities or by Mrs. Hadley herself. When the police arrived at the residence, Mrs. Hadley immediately emerged and blurted out the challenged statements without any questioning or prompting whatsoever. Finally, her statements

---

[16] I am indebted to the South Carolina Court of Appeals for its comprehensive survey of post-*Crawford* decisions in *State v. Davis,* 613 S.E.2d 760, 768-75 (S.C. Ct. App. 2005). I further note that the U.S. Supreme Court recently granted certiorari in two of these cases. *See Hammon v. Indiana,* 126 S. Ct. 552 (2005); *Davis v. Washington,* 126 S. Ct. 547 (2005).

were not overly detailed or "testimonial" in nature, but were limited to the information necessary for the police officers to address the immediate exigencies of the situation. Thus, I would hold, in accordance with the substantial weight of post-*Crawford* authority, that these factors demonstrate the non-testimonial nature of Mrs. Hadley's statements to the police.[17]

    **c. Defendant Has Failed to Satisfy the Second and Third Prongs of the "Plain Error" Standard.**

   Even assuming that Mrs. Hadley's statements to the police were "testimonial," and therefore subject to exclusion under *Crawford,* we find that Defendant has not satisfied the remaining prongs of the plain error standard that governs his challenge on this issue. Under the second prong of this standard, Defendant must establish that the district court's error was "plain," meaning that it is "obvious" or "clear under current law." *United States v. Olano,* 507 U.S. 725, 734, 113 S. Ct. 1770, 1777 (1993). As should be evident from the foregoing discussion, the admissibility of excited utterances in the wake of *Crawford* remains anything but "clear" or "obvious," and the limited federal appellate case law tends to support the district court's ruling in this case.

   Turning to the third prong of the plain error standard, Defendant has failed in two respects to establish that the admission of his wife's out-of-court statements affected his substantial rights. First, even if the district court had excluded all of Mrs. Hadley's statements to the police on the night of Defendant's arrest, the evidence still would have been sufficient to sustain Defendant's felon-in-possession conviction under a theory of constructive possession. "Evidence of constructive possession suffices to satisfy the requirement under § 922(g)(1) of proof that a defendant possessed a firearm," and constructive possession, in turn, "exists when a person does not have actual possession but instead knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." *United States v. Kincaide,* 145 F.3d 771, 782 (6th Cir. 1998) (internal quotation marks and citations omitted), *cert. denied,* 525 U.S. 1166 (1999). Moreover, "constructive possession may be proved by direct or circumstantial evidence," and "it need not be exclusive but may be joint." *United States v. Craven,* 478 F.2d 1329, 1333 (6th Cir.), *cert. denied,* 414 U.S. 866 (1973).

---

  **[17]**I also believe that this result would be fully consistent with the post-*Crawford* writings of Professor Richard Friedman, the source of this circuit's definition of "testimonial" statements. In addressing the somewhat analogous example of statements made during 911 calls, Professor Friedman advocates a "case-by-case assessment," turning on such factors as (i) whether the call reports an ongoing incident or instead "occurs a considerable time after the particular episode has closed," (ii) whether the caller "perceives that she is . . . in immediate danger" or calls with the "primary purpose . . . to initiate investigative and prosecutorial machinery," and (iii) whether "the caller's motives are mixed," reflecting an awareness "that what she says has potential evidentiary value." Richard D. Friedman, *The Confrontation Clause Re-Rooted and Transformed,* 2004 Cato Sup. Ct. Rev. 439, 459-60 (2004). I have considered each of these factors, among others, in concluding that Mrs. Hadley's statements were not testimonial.

  Notably, the factors cited by Professor Friedman appear designed to address concerns about the reliability of statements made during 911 calls. By advocating such inquiries as whether the declarant faces an immediate danger and whether she has mixed motives, Professor Friedman seemingly urges that statements made during 911 calls should be deemed "non-testimonial" only where the declarant lacks the opportunity for calculation or deception. As discussed earlier, these same indicia of reliability and truthfulness underlie the hearsay exception for excited utterances. In light of our ruling here that Mrs. Hadley's statements were admissible as excited utterances under Rule 803(2), it seemingly would follow that these statements were not "testimonial" under the analytical approach advocated by Professor Friedman.

  Nonetheless, I acknowledge and readily agree with Professor Friedman's larger point that each case must be decided on its own specific facts. In particular, I do not advocate a bright-line rule that statements that qualify as "excited utterances" under Fed. R. Evid. 803(2) are invariably "non-testimonial" under *Crawford.* Rather, I share the view expressed by the First Circuit in *Brito,* 427 F.3d at 61-62, that there is a significant degree of overlap in the evidentiary inquiry whether a statement is an excited utterance and the constitutional inquiry whether a statement is "testimonial." This is particularly true under the broad definition of "testimonial" statements propounded by Professor Friedman and applied by this court in *Cromer.*

The undisputed record in this case shows that the firearm that formed the basis for the felon-in-possession charge was found in a drawer of an armoire that was located in a bedroom shared by Defendant and his wife. A finding of constructive possession may properly rest upon "[p]roof that the person has dominion over the premises where the firearm is located." *Kincaide,* 145 F.3d at 782 (internal quotation marks and citation omitted); *see also United States v. Layne,* 192 F.3d 556, 572 (6th Cir. 1999), *cert. denied,* 529 U.S. 1029 (2000); *United States v. Shores,* No. 02-6476, 2004 WL 690163, at *3 (6th Cir. Mar. 30, 2004) (finding that the defendant's constructive possession of a firearm was established through evidence that the gun was found in the defendant's bedroom, "a room in a house over which he had dominion and control"). At a minimum, then, the evidence would have permitted the inference that Defendant had constructive possession, if perhaps only jointly with his wife, over a weapon kept in the couple's bedroom.

Nothing in the record rebutted this inference. There was no evidence at trial, for example, that Defendant was unaware of the presence of a gun in his bedroom.[18] Rather, Defendant offered only his brother's testimony that Defendant did not own a gun, but that Mrs. Hadley did. Not only is this testimony regarding ownership irrelevant to a theory of joint constructive possession, *see, e.g., United States v. Yirkovsky,* 338 F.3d 936, 939 (8th Cir. 2003); *United States v. Alanis,* 265 F.3d 576, 592 (7th Cir. 2001), *cert. denied,* 535 U.S. 1095 (2002), but it suggests the likelihood that Defendant, like his brother, was aware that his wife owned a gun. In addition, the police officers' discovery of a gun holster in plain view in the Hadleys' bedroom seemingly would suggest an occupant's awareness that a gun might also be found in this room. Finally, the weapon was readily seen upon opening a drawer, as opposed to being hidden or locked away in a location where a household resident might not come across it. Consequently, we cannot say that the admission of Mrs. Hadley's out-of-court statements regarding Defendant's possession of a gun "affected the outcome of the district court proceedings," *Olano,* 507 U.S. at 734, 113 S. Ct. at 1778, where Defendant's felon-in-possession conviction could be sustained even without these statements.

Moreover, even if Defendant had anticipated the ruling in *Crawford* and objected to the admission of his wife's statements on Confrontation Clause grounds, the Government might well have elected to respond to this constitutional challenge by calling Mrs. Hadley as a witness at trial. As noted earlier, if Mrs. Hadley had taken the stand, her resultant availability for cross-examination would have removed any Confrontation Clause "constraints . . . on the use of h[er] prior testimonial statements." *Crawford,* 541 U.S. at 59 n.9, 124 S. Ct. at 1369 n.9 (citing *California v. Green,* 399 U.S. 149, 90 S. Ct. 1930 (1970)). In this event, regardless of whether the district court excluded Mrs. Hadley's out-of-court statements to the police on the night of her husband's arrest, the jury still would have heard evidence of Defendant's actual possession of a firearm that evening, either through Mrs. Hadley's trial testimony or through her prior grand jury testimony. *See* Fed. R. Evid. 801(d)(1)(A). To demonstrate an effect upon his substantial rights under these circumstances, then, Defendant must at least suggest some reason why this would not have been the likely outcome of a Confrontation Clause challenge to the admission of his wife's out-of-court statements.

Defendant's only answer on this point is that his wife might have been unavailable to testify at trial, presumably due to the marital privilege that permits a witness-spouse to refuse to testify adversely to a defendant-spouse in a criminal or related proceeding. *See Trammel v. United States,* 445 U.S. 40, 53, 100 S. Ct. 906, 914 (1980). Yet, we cannot know whether Mrs. Hadley would have elected to invoke this privilege. Nor do we know whether she would have testified "adversely" to Defendant, as required to invoke the privilege, *see Trammel,* 445 U.S. at 53, 100 S. Ct. at 914, where her testimony at the pretrial detention hearing and at sentencing was generally favorable to her husband. Finally, it might well be the case that Mrs. Hadley waived her privilege by agreeing to take the stand on Defendant's behalf at the detention hearing, and by testifying on the very same subject addressed in her out-of-court statements — namely, whether Defendant possessed a gun on the night of his arrest. *See United States v. Yerardi,* 192 F.3d 14, 18 (1st Cir. 1999) (considering, but not deciding, whether a spouse might waive the marital testimonial privilege by testifying at an earlier hearing in the same criminal case).

---

[18]Although Defendant advanced this claim in his testimony at sentencing, no such evidence was offered at trial.

All of this uncertainty regarding the effect of the District Court's purported error upon the outcome of the proceedings in the court below is fatal to Defendant's claim of plain error. It is Defendant, after all, who "bears the burden of persuasion with respect to prejudice" under the third prong of the plain error standard. *Olano,* 507 U.S. at 734, 113 S. Ct. at 1778. Under the record before us, we are at a loss to say how matters might have transpired differently if Defendant had raised a Confrontation Clause challenge at trial. Given this absence of any discernible effect upon Defendant's substantial rights, we find no plain error in the admission of Mrs. Hadley's out-of-court statements at Defendant's trial.[19]

**B.     The District Court Did Not Err in Admitting an Audiotape of a Telephone Call Placed by Defendant from the County Jail.**

As his next issue on appeal, Defendant argues that the District Court erroneously admitted an audiotape recording and corresponding transcript of a November 7, 2002 telephone call he made to his wife from the county jail where he was incarcerated while awaiting trial. In support of this challenge, Defendant contends that the authentication of this recording — and, more specifically, the identification of him as one of the speakers on this recorded call — impermissibly rested upon a conversation he had with a jail official, Deputy Ronald Locke. Because Deputy Locke initiated this conversation with the specific objective of gaining familiarity with Defendant's voice for identification purposes, and because defense counsel was not present during the conversation, Defendant argues that the recording should have been excluded as tainted by a procedure that violated his Sixth Amendment right to counsel. As with Defendant's other evidentiary challenge, we review the district court's decision to admit the recording for an abuse of discretion. *See Schreane,* 331 F.3d at 564.

Regardless of the propriety of Deputy Locke's conversation with Defendant outside the presence of his attorney, we find no abuse of discretion in the admission of the recording in question. As the Government correctly points out, the factual predicate for Defendant's Sixth Amendment claim is wholly absent as to this particular recording — specifically, the one capturing a November 7, 2002 telephone conversation — because there is no evident link between Deputy Locke's purportedly improper conversation with Defendant and the identification of the voice on this recording. Rather, Deputy Locke relied upon another means of identifying Defendant's voice on this call, ones that were entirely independent of his conversation with Defendant.

Deputy Locke's testimony about his conversation with Defendant was elicited in the context of a ***different*** recording, capturing an earlier telephone call made from the booking area of the county jail on September 5, 2002. As the deputy explained at trial, calls made from the housing area of the jail include a recorded preamble identifying the inmate who originated the call. Calls initiated from the booking area, in contrast, do not — or at least did not at the time — include this identifying greeting. Thus, in order to identify Defendant as one of the speakers on the September 5, 2002 call from the booking area, Deputy Locke testified that he relied in part upon his face-to-face conversation with Defendant at the jail. Defense counsel objected to this testimony, citing both the Sixth Amendment right to counsel and a claimed Fourth Amendment protection against recording telephone conversations without notice to the participants.[20] The district court sustained this objection and excluded the recording of the September 5, 2002 telephone call, without specifying the grounds for this ruling.

Following this ruling, the Government sought to introduce the recording at issue on appeal, capturing a telephone call initiated from the housing area of the jail on November 7, 2002. Notably, in his testimony regarding the identification of the speakers on this recording, Deputy Locke never once referred to his

---

[19]Having determined that at least two of the first three prongs of the plain error standard are not satisfied, we need not address the fourth prong of this standard.

[20]Deputy Locke testified that inmates are warned that their telephone calls from the housing area of the jail are being recorded, but that no such warning is given as to calls originated from the booking area.

conversation with Defendant at the jail. Rather, the deputy explained that Defendant expressly "g[a]ve his name" on the tape, identifying himself as originating the collect call captured on the recording. (11/13/2002 Trial Tr. at 133, J.A. at 70.) Deputy Locke further testified that the voice on this recording matched the voice on recordings of other calls made using Defendant's inmate ID number. Based on this testimony, the district court admitted the recording. Because this ruling in no way depended upon the deputy's purportedly improper jailhouse conversation with Defendant, we find no merit in Defendant's challenge to this ruling.[21]

## C.     Defendant Is Entitled to Resentencing in Light of *Booker* and This Court's Post-*Booker* Decisions.

Finally, Defendant challenges his sentence on two grounds. First, he contends that the district court erred in its factual finding at sentencing that Defendant's felon-in-possession offense involved the use or possession of the subject firearm "in connection with . . . a crime of violence," U.S.S.G. § 4B1.4(b)(3)(A), resulting in an offense level increase from 33 to 34 under the federal sentencing guidelines. Next, in letters submitted following the initial round of briefing, Defendant argues that he is entitled to resentencing in light of the Supreme Court's recent rulings in *Blakely v. Washington,* 542 U.S. 296, 124 S. Ct. 2531 (2004), and *United States v. Booker,* ___ U.S. ___, 125 S. Ct. 738 (2005). As discussed below, we agree that resentencing is required under this circuit's post-*Booker* precedents. Nonetheless, because the district court still must "take account" of the sentencing guidelines at resentencing, *Booker,* ___ U.S. at ___, 125 S. Ct. at 764, we first address Defendant's challenge to the district court's application of the guidelines at his initial sentencing.

In light of Defendant's concession at his sentencing hearing that he is an armed career criminal within the meaning of U.S.S.G. § 4B1.4(a), (*see* 3/21/2003 Sentencing Hearing Tr. at 7, J.A. at 93), the determination of Defendant's offense level under the sentencing guidelines turns upon the resolution of only a single factual dispute. Specifically, if Defendant "used or possessed" the firearm involved in his felon-in-possession offense "in connection with . . . a crime of violence," the guidelines dictate an offense level of 34. U.S.S.G. § 4B1.4(b)(3)(A). Absent this finding, Defendant's offense level would be 33. U.S.S.G. § 4B1.4(b)(3)(B). Upon considering the trial record and the testimony and other evidence introduced at sentencing, the district court found that "the possession of a firearm that was determined by the jury in this case was in connection with a crime of violence, that is, the aggravated assault on Mrs. Hadley." (6/6/2003 Sentencing Hearing Tr. at 77, J.A. at 115.)

In challenging this finding on appeal, Defendant argues that the Government did not meet its burden of establishing the requisite crime of violence by a preponderance of the evidence, as the proof offered by the Government on this point purportedly lacked sufficient indicia of reliability. In particular, Defendant notes that the crime of violence identified by the district court, an aggravated assault, rested upon the court's finding that Defendant held a gun to his wife's head. Defendant further observes that the only items of evidence offered in direct support of this specific finding were Mrs. Hadley's unsworn written statement to the police on the night of Defendant's arrest and her testimony before the grand jury. Neither of these items, in Defendant's view, meets the standard of reliability necessary to sustain the district court's factual finding, particularly in light of Mrs. Hadley's express testimony at sentencing that she did ***not*** witness her husband hold a gun to her head on the night in question.

As Defendant recognizes, "the district court may consider and rely on hearsay evidence as long as the evidence bears some minimal indicia of reliability." *United States v. Mayle,* 334 F.3d 552, 559 (6th Cir. 2003); *see also* Fed. R. Evid. 1101(d)(3); U.S.S.G. § 6A1.3(a). Nonetheless, Defendant argues that Mrs. Hadley's statements to the police and the grand jury fail to meet even this modest standard, where Mrs. Hadley retreated from these statements at sentencing and denied any knowledge that her husband had held

---

[21]In light of this determination, we need not reach the question whether the deputy's conversation with Defendant outside the presence of his attorney implicated the Sixth Amendment right to counsel.

a gun to her head. *See United States v. Winters,* 33 F.3d 720, 723 (6th Cir. 1994) (upholding the trial court's determination that a hearsay statement offered as an excited utterance "carried no indicia of reliability," where the declarant "changed his story on more than one occasion"), *cert. denied,* 513 U.S. 1172 (1995). Defendant further maintains that these statements are unreliable in light of the purported lack of corroboration in the record. *See United States v. Herrera,* 928 F.2d 769, 773-74 (6th Cir. 1991) (citing the presence of corroborating evidence as permitting the district court's reliance on information in a presentence report that was supplied by an informant).

We discern no error in the district court's reliance upon Mrs. Hadley's written statement and grand jury testimony in determining that Defendant's conduct triggered a sentencing enhancement for a "crime of violence." As a threshold matter, even if the district court had strictly adhered to the rules of evidence at sentencing, the grand jury testimony could have been admitted under Fed. R. Evid. 801(d)(1)(A), which permits the substantive use of the prior statement of a testifying witness so long as certain conditions are met. On direct examination by defense counsel at Defendant's sentencing hearing, Mrs. Hadley expressly acknowledged having testified before the grand jury that she had seen Defendant with a gun, but she explained that she had merely "felt" an object and "just assumed that's what it was." (3/21/2003 Sentencing Hearing Tr. at 17-18, J.A. at 99-100.) Mrs. Hadley further testified that she could not "remember what I said" in her grand jury testimony, blaming this memory loss on her use of Prozac. (*Id.* at 17, J.A. at 99.) As this and other courts have held under analogous facts, such limited and vague recall of events, equivocation, and claims of memory loss satisfy the requirement of Rule 801(d)(1)(A) that a prior statement be "inconsistent with the declarant's testimony." *See United States v. Distler,* 671 F.2d 954, 958 (6th Cir.), *cert. denied,* 454 U.S. 827 (1981); *see also United States v. DiCaro,* 772 F.2d 1314, 1321-22 (7th Cir. 1985), *cert. denied,* 475 U.S. 1081 (1986); *United States v. Williams,* 737 F.2d 594, 608 (7th Cir. 1984), *cert. denied,* 470 U.S. 1003 (1985).[22] If a prior statement is sufficiently reliable to be substantively admissible under the rules of evidence, such a statement surely possesses the "minimal indicia of reliability" necessary for its use at sentencing.[23]

Moreover, Mrs. Hadley's grand jury testimony serves as direct corroboration of the salient portion of her written statement to the police on the night of Defendant's arrest — namely, the passage stating that her husband "held a gun to my head and said he was going to kill me." (5/25/2002 Statement, J.A. at 11.) Both the grand jury testimony and written statement, in turn, are consistent with the trial testimony of Officer Jenkins, who testified that Mrs. Hadley's excited utterances upon running from her house included the statement that "he put a gun up to her head." (11/12/2002 Trial Tr. at 30, J.A. at 43.) Even assuming, then, that the reliability of any one of Mrs. Hadley's several out-of-court claims of a "gun to my head" might be open to question if viewed in isolation, the cumulative weight of these statements — two of which, as we have explained, were substantively admissible under the rules of evidence[24] — surely assuages any concern that the Government's proofs lacked the "minimum indicia of reliability" needed to sustain the district court's "crime of violence" enhancement.

---

[22]It is not clear from the record whether an actual transcript of Mrs. Hadley's grand jury testimony was admitted as an exhibit at sentencing. Nonetheless, the district court unquestionably was made familiar with the substance of this testimony, both through the testimony of Mrs. Hadley on direct and cross-examination and through the arguments of counsel at the sentencing hearing. It also is evident, as discussed below, that the district court relied in part on Mrs. Hadley's grand jury testimony in applying a "crime of violence" enhancement.

[23]We again note that the introduction of this statement posed no Confrontation Clause concerns, in light of Defendant's decision to call his wife as a witness at the sentencing hearing. *See Crawford*, 541 U.S. at 59 n.9, 124 S. Ct. at 1369 n.9.

[24]Even Mrs. Hadley's unsworn written statement to the police would have been admissible to impeach her, if not for a substantive purpose. *See* Fed. R. Evid. 613(b). As discussed below, the district court clearly viewed this statement as raising questions about the veracity of Mrs. Hadley's testimony at the sentencing hearing.

In addition, the Government correctly points out that Mrs. Hadley's various statements, if not her specific claim of a gun to her head, were corroborated on a more general level by other evidence introduced at trial and sentencing. First, her claim of a gun was borne out through her ability to quickly lead the police to this weapon in a drawer in the bedroom shared by her and her husband. Next, we have already noted the ample and uniform testimony, from Government and defense witnesses alike, of a domestic disturbance that was serious enough to warrant two 911 calls requesting immediate police intervention.[25] According to one witness, Officer Jenkins, these 911 calls triggered a police dispatch for a "domestic disturbance with a gun" at the Hadley residence. Finally, in her testimony at sentencing, Mrs. Hadley did not squarely state that she had fabricated the claim about Defendant holding a gun to her head, nor did she deny that she and her husband had been involved in a domestic dispute that warranted police intervention. Instead, she merely testified to a mistaken "assumption" that Defendant had held a gun to her head.

Viewing this record as a whole, we find no basis to disturb the district court's finding that the gun involved in Defendant's felon-in-possession conviction was possessed in connection with a crime of violence. In support of this determination, the district court cited the jury's guilty verdict as likely resting upon a finding beyond a reasonable doubt that Defendant "in fact possessed a firearm" in the course of his dispute with his wife. (6/6/2003 Sentencing Hearing Tr. at 74-75, J.A. at 112-13.) Next, in assessing the credibility of Mrs. Hadley, the court found that she "loves her husband, and she will do anything at all that she can, within reason, to help him and to prevent him from going to jail for a long time." (*Id.* at 75, J.A. at 113.) The district court then stated:

> The Court makes a finding that someone called the police on this night — I believe the date was May 2nd, 2002 — concerning a dispute that was going on. When the police arrived, Mrs. Hadley ran out of the house and made statements to the effect that "He is trying to kill me," or "He's going to kill me. He has a gun." Later on she gave a statement, a written statement, to the police officers. Subsequently she testified in the grand jury, I believe, in August of 2002, where her testimony was substantially similar to the statements that she had made on the night in question. Later on, at a hearing in front of one of the magistrates, she made a contrary statement. Then, before this Court, the defendant put Mrs. Hadley on the stand to testify, and she has not testified that she lied; she has testified that she does not recall what happened, she has testified that she does not remember, she has testified that she made some assumptions, but she never said that she lied.
>
> The reason advanced by the defense for Mrs. Hadley's initial statements was that as a result of this dispute Mrs. Hadley wanted to get the defendant out of the house. That would mean, then, that Mrs. Hadley, contrary to the testimony of the defendant, wanted the defendant to leave, not that she wanted to leave. So she decides to concoct a lie, a story. And she must have decided this sometime between the time that the police officers arrived and she was released from — she was released by her husband. So she comes running out of the house, and she has thought that "What I have to say is that he has a gun, because that will achieve my new goal, not my old goal." So she tells the police officers that "[h]e has a gun," that "[h]e is trying to kill me." When the police officers do not respond in the way that she wants, she takes them back to the house and she leads them to a gun that just happens to be in the house.
>
> Later on, when she testifies before the grand jury, she decides to stick to her old story even though at this point she has not committed perjury, she has just made statements to

---

[25]Even Defendant acknowledged in his testimony at sentencing that he and his wife "did some arguing," that Mrs. Hadley "got hysterical" and wanted to leave the house, that he "held her" and told her "[y]ou're not going nowhere," and that he told one of his guests to "[s]tay out of my business" when he attempted to intervene in the domestic dispute between Defendant and his wife. (6/6/2003 Sentencing Hearing Tr. at 19, J.A. at 108.) Defendant denied, however, that he ever "g[o]t physical with" or harmed Mrs. Hadley, and he specifically denied that he possessed a gun during this incident. (*Id.* at 13, 19, J.A. at 106, 108.)

police officers and she has written a note, but she has not testified under oath where she was sworn.

The Court has not been presented any reason for why she would do this, especially in light of the apparent affection that she still has for Mr. Hadley. And even though she might subject herself to prosecution by admitting that she had lied in her testimony before the grand jury and she had lied to the police officers, with the love that she has for her husband, I'm not sure that she would not be willing to do that if she had in fact not been telling the truth at the beginning.

The Court makes a finding, then, that the presentence report is substantially accurate and that the possession of a firearm that was determined by the jury in this case was in connection with a crime of violence, that is, the aggravated assault on Mrs. Hadley.

(*Id.* at 75-77, J.A. at 113-15.)

These factual findings properly rest in part upon credibility determinations that are uniquely within the province of the district court, and that we will not disturb unless they are "clearly contrary to the facts." *Mayle,* 334 F.3d at 559. Defendant has not identified any error, much less clear error, in the district court's assessment of the credibility of the witnesses who testified at sentencing. The remaining support for the district court's findings can be found in evidence that was either admissible under the ordinary rules of evidence or was corroborated by admissible evidence. Consequently, we reject Defendant's contention that the findings at sentencing were impermissibly based upon unreliable evidence.

Nonetheless, Defendant is entitled to resentencing under this court's post-*Booker* decisions. *Booker* holds that the Sixth Amendment is violated by a sentencing judge's determination of "[a]ny fact (other than a prior conviction)" that is used under a mandatory sentencing guideline regime "to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict . . . [or] admitted by the defendant." *Booker,* 125 S. Ct. at 750, 756, 764. Because Defendant did not interpose any such Sixth Amendment objection at sentencing, and did not challenge the district court's reliance on the sentencing guidelines as establishing mandatory limits on his sentence, we review only for plain error. *See United States v. Barnett,* 398 F.3d 516, 525 (6th Cir. 2005); *United States v. Oliver,* 397 F.3d 369, 377 (6th Cir. 2005).

Under *Barnett* and our other post-*Booker* precedents, our plain error review here is entirely straightforward. The first two prongs of the plain error standard — that there must be an "error," and that this error must be "plain," *see Johnson,* 520 U.S. at 467, 117 S. Ct. at 1549 — are satisfied by virtue of the district court's factual determination that Defendant possessed a firearm in connection with a "crime of violence," and its use of this finding to apply a mandatory sentencing enhancement. As a result of this "crime of violence" determination, the district court imposed a one-level increase (from 33 to 34) under U.S.S.G. § 4B1.4(b)(3), computed a mandatory sentencing guideline range of 262 to 327 months of imprisonment, and sentenced Defendant at the bottom of this range. Absent this finding, Defendant's offense level would have been 33, and his sentencing range would have been 235 to 293 months. Although the district court still could have imposed the very same 262-month sentence within this decreased range, whether under a mandatory or advisory sentencing guideline regime, we have held that a defendant's sentencing "under the pre-*Booker* mandatory Sentencing Guidelines," standing alone, is sufficient to satisfy the first two prongs of the plain error standard. *United States v. Trammel,* 404 F.3d 397, 401 (6th Cir. 2005); *see also Barnett,* 398 F.3d at 525-26.

Our precedents further establish that the third and fourth prongs of the plain error standard are satisfied here. Under *Barnett,* we presume that Defendant's substantial rights were affected by the district court's application of mandatory sentencing guidelines, and that he might have received a lesser sentence if the district court had regarded the guidelines as merely advisory. *See Barnett,* 398 F.3d at 527-29.

Nothing in the record rebuts this presumption, particularly where Defendant was sentenced at the very bottom of the applicable guideline range. *See Trammel,* 404 F.3d at 402 (finding that this circumstance bolsters, rather than rebuts, the *Barnett* presumption of prejudice). Finally, *Barnett* instructs that a sentence "imposed under a mandatory Guidelines regime" warrants the exercise of our discretion under the fourth prong of the plain error standard to correct an error that "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Barnett,* 398 F.3d at 529-30 (internal quotation marks and citation omitted). Consequently, we vacate Defendant's sentence and remand for resentencing.[26]

## IV. *CONCLUSION*

For the reasons set forth above in all but parts III.A.1, III.A.3.a, and III.A.3.b of this opinion, we AFFIRM the conviction of Defendant/Appellant Jerome Hadley, but VACATE his sentence and REMAND for resentencing.

---

[26]On remand, the district court is free, of course, to again consider the one-level "crime of violence" enhancement that was imposed at Defendant's initial sentencing, so long as the resulting sentencing range is treated as advisory rather than mandatory.

_____

## CONCURRENCE

_____

SUTTON, Circuit Judge, concurring. I concur in parts I, II, III.A.2, III.A.3.c, III.B, III.C and IV of Judge Rosen's thorough opinion. I respectfully do not join sections III.A.1, III.A.3.a and III.A.3.b of the opinion, which address the merits of Hadley's Confrontation Clause claim. While I have considerable sympathy for many of the points raised in those sections, I would conclude that Hadley did not establish plain error in this instance—most notably because he did not show that the admission of his wife's statements affected his "substantial rights," as is required under the third prong of the plain-error analysis. *United States v. Olano*, 507 U.S. 725, 734 (1993). "An error affects substantial rights when the error was prejudicial, that is, when it 'affected the outcome of the district court proceedings.'" *United States v. Page*, 232 F.3d 536, 544 (6th Cir. 2000) (quoting *Olano*, 507 U.S. at 734). As the majority correctly observes, a jury readily could have convicted Hadley without these statements under a constructive-possession theory. "Constructive possession exists when a person does not have actual possession but instead knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others. Proof that the person has dominion over the premises where the firearm is located is sufficient to establish constructive possession." *United States v. Kincaide*, 145 F.3d 771, 782 (6th Cir. 1998) (quotations and citations omitted); *see also, e.g.*, *United States v. Gunn*, 369 F.3d 1229, 1235 (11th Cir. 2004) (upholding possession-of-firearm conviction under a constructive-possession theory); *United States v. Wahl*, 290 F.3d 370, 375–76 (D.C. Cir. 2002) (same); *United States v. Lopez*, 271 F.3d 472, 488 (3d Cir. 2001) (same); *United States v. Gill*, 58 F.3d 334, 337 (7th Cir. 1995) (same); *United States v. Rogers*, 41 F.3d 25, 29 (1st Cir. 1994) (same); *United States v. Jones*, 945 F.2d 747, 749–50 (4th Cir. 1991) (same); *United States v. Perez*, 897 F.2d 751, 754 (5th Cir. 1990) (same); *United States v. Patterson*, 886 F.2d 217, 219 (8th Cir. 1989) (same); *United States v. Cardenas*, 864 F.2d 1528, 1533 (10th Cir. 1989) (same); *United States v. Rivera*, 844 F.2d 916, 925 (2d Cir. 1988) (same); *United States v. LaGue*, 472 F.2d 151, 152 (9th Cir. 1973) (same). More specifically, this court has held that discoveries of a firearm in a master bedroom closet of the defendant's residence, *United States v. Bingham*, 81 F.3d 617, 633–34 (6th Cir. 1996), and in a dresser by the defendant's bed, *United States v. Layne*, 192 F.3d 556, 572 (6th Cir. 1999), sufficed to support a felon-in-possession conviction on a constructive-possession theory.

In this case, officers found a gun and a gun holster in Hadley's master bedroom, and Hadley nowhere argues that he did not have dominion and control over the bedroom. The jury also heard a recorded prison telephone call between Hadley and his wife from which it readily could have concluded that Hadley was attempting to persuade his wife to take responsibility for his gun. *See* Hadley Br. at 6 (noting that Hadley told his wife "let the statement be that . . . I didn't have a gun" and "if you go along with what the DA is saying, they gonna give me a life sentence"). On the basis of this phone call and the location of the gun and holster, a jury could well conclude that Hadley possessed the gun. Since this conclusion alone would suffice to support Hadley's conviction, we need not address the difficult *Crawford* issues that this case otherwise presents. *See United States v. Smith*, 419 F.3d 521, 530 (6th Cir. 2005) (rejecting claim because it did not satisfy the third plain-error prong without determining whether an error occurred); *United States v. Kerr*, No. 00-1549, 2002 U.S. App. LEXIS 22971, at *7–16 (6th Cir. Oct. 31, 2002) (same); *United States v. Rice*, No. 02-5674, 2004 U.S. App. LEXIS 3434, at *15 (6th Cir. Feb. 20, 2004) (holding that where a claim does not satisfy the fourth plain-error prong, "we need not decide whether it satisfies any of the other components of the plain-error inquiry"); *United States v. Holt*, No. 00-5904, 2002 U.S. App. LEXIS 18718, at *4–8 (6th Cir. Sept. 10, 2002) (rejecting a claim because it did not satisfy the fourth plain-error prong without determining whether an error occurred); *see also United States v. Cotton*, 535 U.S. 625, 632–33 (2002) (declining to decide the third plain-error prong because the claim did not satisfy the fourth prong); *United States v. Valentine*, Nos. 00-1590, 00-1603, 00-1604, 00-1615, 00-1651, 00-1958, 2003 U.S. App. LEXIS 14557, at *42–43 (6th Cir. July 17, 2003) (same); *cf. Saucier v. Katz*, 533 U.S. 194, 200–01 (2001) (requiring, in qualified immunity settings, that courts address the constitutionality of the government

employee's action before determining whether the claimant's constitutional rights were clearly established); *Lyons v. City of Xenia*, 417 F.3d 565, 580–84 (6th Cir. 2005) (Sutton, J. concurring).