DECISION AND JUDGMENT ENTRY
{¶ 1} This appeal is from the August 25, 2005 judgment of the Lucas County Court of Common Pleas, which sentenced appellant following his conviction of aggravated burglary, R.C. 2911.119(A)(1), with a firearm specification, R.C. 2941.145, and aggravated robbery, R.C.2911.01(A)(1), with a firearm specification, R.C. 2941.145. Upon consideration of the assignments of error, we affirm, in part, the decision of the lower court. Appellant, Albert Quinn, asserts the following assignments of error on appeal: *Page 2 
 {¶ 2} "I. The trial court erred in permitting witnesses to testify to statements made by one of the victims who was unavailable to testify. Quinn's rights under the Confrontation Clause of the Sixth Amendment were violated.
 {¶ 3} "II. The verdict was against the manifest weight of the evidence.
 {¶ 4} "III. Quinn's trial counsel provided ineffective assistance by not seeking separate trials for Quinn and Reardon.
 {¶ 5} "IV. Quinn's sentence was unconstitutional under Foster because the trial court made findings of fact pursuant to R.C. 2929.14(B) and R.C. 2929.11.
 {¶ 6} "V. The prosecutor engaged in misconduct through the frequent use of references to Reardon's drug trafficking activities and using those to then improperly impugn Quinn's character."
 {¶ 7} Appellant and Chuck Reardon were both indicted on January 18, 2005, with respect to the burglary and robbery of a home that day. The following evidence was submitted at trial by the prosecution.
 {¶ 8} Colleen Martinez testified that Mark Silva lives with her and her three children. Her two half-brothers, Joshua Brimmer and Antonio Escobar, were also living when them at the time of this incident, as well as Lauren Bair, the girlfriend of Escobar.
 {¶ 9} In the early evening of January 18, 2005, all of the children and all of the adults, except for Brimmer, were inside their home at 914 Baker Street, Toledo, Ohio. Martinez saw four people approaching the back door of her house from the alley wearing dark clothing. It was dark outside and they had their heads down. At first, she thought it *Page 3 
was Joshua coming back into the house because he had just left. The men tried to open the door. Then they pounded on it up to 30 times trying to break through. There were metal clamps on the back door with a two-by-four across the door that prevented them from breaking through. The men eventually broke through a second rear door that Bair and Escobar were trying to hold shut. Martinez saw Bair and Escobar run past her as four men followed them. Martinez recognized two of the men, appellant and Charles Reardon. Martinez believed that the men were looking for $19,000 in cash that Bair had received that day from the settlement of a lawsuit. Martinez also recalled that after she and Bair had arrived home after cashing the check, appellant's girlfriend, Sandrina Garcia, visited Martinez's home for a few minutes. Garcia left about ten minutes before the four men arrived.
 {¶ 10} Martinez further testified that she saw appellant carrying a sawed-off shotgun at his side, pointed to the ground. As the four men went through the house, they would pass the shotgun to each other. When Martinez demanded that they leave, appellant pointed the gun at her head and told her to be quiet. Reardon pushed her out of the way and told her to get down. Martinez also saw two of the men point the gun at Escobar. However, while Martinez told the police about the shotgun, she never made a statement at the time of the incident about appellant pointing the gun at her.
 {¶ 11} Martinez testified that the men left suddenly. She thought that they may have left because they heard Silva break the front window and knew that he had left through it. The police arrived a few minutes later. *Page 4 
 {¶ 12} Martinez also testified that although three of the men had their faces covered with bandanas, the bandanas began to fall off while they were running through the house. The fourth man had a do rag over his face and she never saw his face. She recognized appellant when his mask fell down below his nose. Martinez recognized appellant and knew him by his first name because Bair had brought him to Martinez's home on New Year's Eve, 17 days prior to the robbery. That night Martinez told Bair not to bring strangers into Martinez's home and the three then left. Martinez also knew that another one of the men, Charles Reardon, lived a few houses away. She had seen him in the neighborhood, but had never spoken to him. She gave the officers the names of these two men.
 {¶ 13} Martinez identified four men a short time later. She saw them from 50 feet away with a spot light shining on them. The men did not wear coats and one did not have shoes. However, she could immediately identify appellant and two of the other men. Although she had not seen the face of one of the men, she thought his general build and his jeans looked familiar. She thought that the fourth man had the same build as Reardon, but she was not sure if it was him because she could not see his eyes. She was then taken to the police station where she identified all four men from a photo array.
 {¶ 14} Silva testified that when the commotion began, he went into the kitchen to see what was happening. He took the phone from Escobar and called 911. He saw only one of the men, Reardon, from a distance of 15 feet, as Reardon entered the living room and pushed Escobar. Reardon wore a hooded sweatshirt and a bandana over his lower *Page 5 
face. After Reardon pushed Escobar, Reardon stepped further into the living room after Escobar. When Reardon realized that Silva was present, he turned to look at Silva. Silva recalled that the robber had a crossed eye, but did not remember that Reardon had one. Silva did not recognize Reardon at first, but later realized that he was the same man he had seen in the neighborhood. Reardon had unique characteristics such as a stocky build, a large head, and crossed-eyes. Silva did not recognize appellant at all. Silva did not see any weapons, but presumed that they had some.
 {¶ 15} Within a minute or two after the men came into the home, Silva broke out the front window and left the home through the window. He ran to a nearby gas station and called 911 again. When he heard the sirens, he went back to the house. When he returned to the home after the police had arrived, he saw Martinez and Bair were very upset. Bair was saying that she had recognized Reardon and appellant.
 {¶ 16} Officer Haynes testified that he had a difficult time trying to get the adults in the home to listen to him and tell him what happened. They were all very upset about the incident. Eventually, they calmed down enough to give him the names of two of the men and descriptions. Bair identified appellant and Reardon. The officer walked one of the women to the corner of the street for a one-on-one lineup while the other woman rode in the police car. Reardon was not in the group of four men that had been removed from Reardon's home. The officer arrested Reardon after he was identified by the victims from a photo array. *Page 6 
 {¶ 17} Officer Scoble testified that when he searched the home, he found a sawed-off shotgun lying on the basement stairs. The gun did not appear to have been placed deliberately on the steps. The parties stipulated that the gun was operable.
 {¶ 18} Officer Martorana testified that he responded to directions given over the radio to proceed to the corner of Baker and Lagrange Streets. His sergeant informed him that the suspects were in the house on the corner. They found two people in a bedroom and two people hiding in the attic. These four people were removed from the house for a one-on-one identification.
 {¶ 19} Officer Murphy testified that he started to patrol the area. Before he left the block, he received information from his sergeant that the suspects had been seen in the 1600 block of Lagrange. When the officer entered Reardon's home, he saw Reardon sitting on the couch in the front room with six or eight other people. Two men were found in separate bedrooms and two more in the attic. He returned to the residence later to arrest Reardon.
 {¶ 20} Officer Cashen testified that he arrived at Reardon's home after several other officers. He assisted in the search. He was the one who went into the attic. He saw one young, heavy set African American in the corner who complied when the officer told him to come down out of the attic. The officer went back up into the attic and found a young, thin white man laying between the rafters.
 {¶ 21} Sergeant Wauford testified that by the time he arrived, apprehension of the suspect was completed. Therefore, he spent most of his time talking to the victims. He *Page 7 
conducted the show-up. The four suspects in the show-up were appellant, a black male, Doc Reardon, a white male, Edward Massengill, a white thin man, and Jamell B., a heavy-set black juvenile. He drove Martinez a short distance to the corner of Bancroft and Baker Streets to see the men. At a distance of 15 feet, she immediately stated that all of the four men appeared to be the ones involved in the incident. She mentioned appellant by name. However, she thought that there was one man missing, a man with unusual eyes.
 {¶ 22} Both of the defendants testified on their own behalf. Chuck Reardon testified that he returned home on January 18, 2005, after visiting a friend's home at 911 Baker Street, which was across the street from the victims' home. At 6:15, while he was in his friend's house, he saw a police officer look into the home while he and his friend were sitting there. He presumed that the officer saw him because he could see the officer. Ten minutes later, he heard glass break and thought someone had thrown a brick through a window. He then heard sirens. A few minutes later, he returned to his home and found the police present. An officer waved him into the house and told him to get on the ground. The police then removed Reardon's brother and two other men from the house. Reardon knew that his brother, Doc Reardon, would hide from the police because he has outstanding warrants. He described his brother as being five-foot, eight-inches tall and weighing 170 pounds. He testified that he is five-foot, ten-inches tall, weighs 220 pounds, and has a lazy eye. Appellant had been removed before Reardon approached the *Page 8 
house because Reardon saw appellant in the police van. About 45 minutes after they left, the police returned and arrested Reardon.
 {¶ 23} Reardon also testified that he is very good friends with appellant, having grown up with him. He further testified that he is a stay-at-home dad and that he supplemented his income by selling crack to a skinny white kid who said it was for Bair and Martinez. He knew who Bair was because she had been at his house for a New Year's Eve party, but he had not actually met her. He had also seen Bair in the neighborhood, as she was the only one that ever came out of the house. Reardon did not know Martinez. He also testified that he did not own a shotgun and had never seen the one he saw the police passing around that night.
 {¶ 24} Appellant testified that he was in Martinez's home with Garcia and another person for about 15-20 minutes on December 31, 2004. When Martinez told them they had to leave, they asked Bair if Martinez wanted to come along and then they all left together. Appellant had been in the Martinez home previously to smoke marijuana with Bair and Garcia. While Martinez was home, appellant did not speak to her during that visit. He had last visited the Martinez home on January 13, 2005. On January 15, he went over to the Martinez house to talk with Bair. After they got in an argument, appellant left.
 {¶ 25} On January 18, appellant had gotten up early to go with Edward Massengill for his job interview. Afterward, they went back to Reardon's home along with Joey Mitchum. He testified that a lot of people, up to 20 men, hang out at Reardon's house on *Page 9 
a daily basis. Appellant went upstairs to lie down that day. Garcia woke him up around 5:30 p.m. and then he went back to sleep. He never saw anyone leave or return to the house. The next thing he knew, the police were pounding on the doors and coming up the stairs. Appellant come out of the room when the officer called out. The officer made appellant lie on the floor and asked him his name. Another officer recognized him. They took him outside without a shirt or socks. He knew that Bair had already received a large sum of money and that she was going to get another large sum of money, but he did not know when. He denied ownership of the shotgun.
 {¶ 26} Appellant also called several witnesses to testify as to his good character. Albert Holland testified that he had known appellant since 1992. Appellant lives with Holland. Holland believed that appellant was a good person. Billi Urban testified that appellant was a good worker, even though he has no permanent employment, and that he is a trusted friend. Urban testified that appellant has smoked marijuana in the past and is currently supported by his mother, Urban, and his friends. Robert Miles testified that appellant is a good person and trustworthy. He met appellant in Tennessee about six years ago before he moved here. Garcia testified that she called Bair on the day of the robbery on behalf of her aunt who wanted to collect some money Bair owed, but Bair was not home. Garcia went to Reardon's home around 5:00 p.m. His wife, Athena, told Bair that appellant was upstairs. Garcia went upstairs to tell appellant she was there and then went back downstairs because he was sleeping. Garcia visited Bair at her home later in the day to tell Bair that Garcia's aunt wanted to talk to Bair. Garcia knew that her aunt *Page 10 
wanted to collect $400 that Bair owed her and that Bair was expecting a large settlement check.
 {¶ 27} Robert Ducat, a/k/a Bobby Ducat, testified for Reardon, that he got off work around 3:30-4:00 on the night of the robbery. Reardon came over to play video games with him around 4:15 p.m. A little while later, Ducat noticed through his bedroom window that a police officer was walking between his house and the neighbor's. Ducat thought this was strange because this was a dead end. Ducat went to the living room and could see that the window across the street was broken. A short time later, he and Reardon went outside and saw all of the police at Reardon's house. They went to the house and an officer at the door waived them inside. Other officers were already in the house. The officers told them to get on the floor. Ducat never saw the police remove anyone from the house. After the police left, they returned later to arrest Reardon. Ducat tried to tell the police that Reardon was innocent, but they would not listen. Ducat also tried to tell someone at the bond hearing that Reardon was innocent, but no one would listen. Ducat knows that Reardon is a drug dealer, but hangs out with him anyway. Ducat has also known appellant since he was young.
 {¶ 28} Athena Reardon, Reardon's wife, testified that Reardon was not home on the night of the Martinez robbery. She believed that Reardon did not return until the police had been there almost an hour. She knew that appellant was in the house that day after he returned with Edward Massengill. Since she did not see him downstairs, she presumed that appellant was upstairs. She did not see him leave the house. *Page 11 
 {¶ 29} In his first assignment of error, appellant argues that he was denied a fair trial when his rights under the Confrontation Clause were violated by the court's admission of Bair's statements (which identified appellant as one of the perpetrators) into evidence when she was unavailable to testify. Appellant also argues that these statements did not meet the requirements to be classified as excited utterances under the hearsay exceptions. However, he makes this argument apparently believing that the test for determining whether the Confrontation Clause was infringed is whether the statement being offered falls under a recognized exception to the hearsay rule. That test, developed inOhio v. Roberts (1980), 448 U.S. 56, 66, was abrogated by Crawford v.Washington (2004), 541 U.S. 36, 60-61. Davis v. Washington (2006), ___U.S.___, 126 S.Ct. 2266, 2276, 74 U.S.L.W. 4356. Therefore, we address only the issue of whether the admission of Bair's statements into evidence violated appellant's rights under the Confrontation Clause.
 {¶ 30} The Confrontation Clause of the Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." This guarantee is made applicable to state prosecutions by theFourteenth Amendment to the United States Constitution. Pointer v.Texas (1965), 380 U.S. 400, 406. This right guarantees that the prior testimonial statements of a witness who is unavailable at trial may not be admitted into evidence unless the defendant had been given a prior opportunity to cross-examine the declarant so that the veracity of the statement could be challenged. Crawford v. *Page 12 Washington (2004), 541 U.S. 36, 53-54. The Crawford court listed, as a minimum parameter, that "testimonial" statements would encompass exparte in-court testimony, extrajudicial statements, and statements taken by police officers in the course of interrogations. Id. at 68. The court emphasized, however, that this right should not be interpreted to eliminate all of the exceptions to the hearsay rule. Such exceptions have historically encompassed only non-testimonial statements, with perhaps one exception for dying declarations. Id. at 56.
 {¶ 31} The United States Supreme Court further defined "testimonial" statements in the context of excited utterances. Davis v.Washington (2006), ___U.S.___, 126 S.Ct. 2266, 2275, 74 U.S.L.W. 4356. The court held that the key is whether the questioning by the police or counterpart of the police was seeking information needed to respond to a present emergency or seeking information about past events as part of its investigation of a crime.
 {¶ 32} Applying the law of these cases, we determined in State v.Reardon, 6th Dist. No. L-05-1275, 2006-Ohio-3984, that Bair's statements were non-testimonial. We held that the officer's interrogation was aimed at resolving the present emergency and apprehending the suspects before they escaped the area or harmed other others in the process of escaping. Our focus was on the purposes of the police interrogation, which was consistent with the prevailing interpretation of the Crawford case. See,State v. Brown, 8th Dist. No. 87651, 2006-Ohio-6267, at ¶ 21; State v.Garrison, 10th Dist. No. *Page 13 
05AP-603, 2006-Ohio-6142, at ¶ 16; State v. Edwards, 4th Dist. No. 06CA5, 2006-Ohio-6288, at ¶ 19; State v. Holdbrook, 12th Dist. No. CA2005-11-482, 2006-Ohio-5841, at ¶ 61; and State v. Johnson, 6th Dist. No. L-05-1001, 2006-Ohio-1232, at ¶ 43 (although we cited U.S. v.Hadley (C.A. 6, 2005), 431 F.3d 484, in this case, our focus was on the officer's purposes more than the expectations of the declarant).
 {¶ 33} Following the release of our decision in State v. Reardon, supra, the Ohio Supreme Court addressed the issue of distinguishing between testimonial and non-testimonial statements in State v.Stahl, 111 Ohio St.3d 186, 2006-Ohio-5482, ¶ 19. In the Stahl case, the court adopted a broad view of the Crawford holding and held that "* * * courts should focus on the expectation of the declarant at the time of making the statement;" and that "* * * the intent of a questioner is relevant only if it could affect a reasonable declarant's expectations." Id. at ¶ 36. This interpretation of the Crawford case is consistent with that of the Sixth Circuit. U.S. v. Hadley (C.A. 6, 2005), 431 F.3d 484,499-500. Because of the Stahl holding, we again address the issue of whether Bair's statements were testimonial.
 {¶ 34} In the case before us, Officer Haynes testified that as he arrived on the scene, the entire neighborhood was pointing them in the direction in which the robbers had fled. He remained with the victims to elicit any additional information about the suspects while his partner went after the suspects. Haynes described the scene inside the house as chaotic. Everyone was angry. They were yelling, screaming, and cursing. The women were busy moving things around. Children were crying. It took a considerable *Page 14 
amount of effort to get Martinez, Bair, and Silva to listen to Haynes. He had to separate them in order to get them to talk to him rather than to each other. He questioned them to get a description of the people and a direction of flight. They all told him that men had attempted to rob them and that they had just left. After a few minutes, Haynes was able to obtain the specific identification of appellant and Reardon and descriptions and markings, height, and weight as to the others from both Martinez and Bair. Even during this interrogation, the women never calmed down. As he was given this information, he immediately relayed it to the other officers by radio.
 {¶ 35} Silva testified that when he returned to the house, an officer was eliciting information from Martinez and Bair. Both women were very emotional. Bair told Silva that she had recognized two of the robbers, appellant and Reardon. He further testified that when they were talking to the officer, the three of them had begun to calm down enough to think through their answers.
 {¶ 36} Upon consideration of the evidence, we find that Bair did not make her identification statements with the intent that they be used as testimonial evidence against appellant. She was still experiencing the stress of the robbery and was answering the officer's questions solely to aid the police in the apprehension of the perpetrators. Under the circumstances of this case, a reasonable person would not have believed that their answers to the officer's questions would be used against the perpetrators at trial. Therefore, we find that Bair's statements were non-testimonial and that the Confrontation Clause was not violated in this case. *Page 15 
 {¶ 37} Appellant's first assignment of error is found not well-taken.
 {¶ 38} In his second assignment of error, appellant argues that the verdict was contrary to the manifest weight of the evidence. Appellant argues that credibility is a significant issue in this case in light of the fact that two of the victims did not testify and Bair's out-of-court statements were admitted.
 {¶ 39} Even if there is sufficient evidence to support the verdict, a court of appeals may decide that the verdict is against the weight of the evidence. State v. Thompkins (1997), 78 Ohio St.3d 380, paragraph two of the syllabus.[1] A challenge to the weight of the evidence questions whether the greater amount of credible evidence was admitted to support the conviction than not. Id. at 386-390. The standard for determining whether a conviction is against the manifest weight of the evidence is whether the appellate court finds that the trier of fact clearly "lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"State v. Smith (1997), 80 Ohio St.3d 89, 114, and State v.Thompkins, supra at 387 quoting State v. Martin (1983),20 Ohio App.3d 172, 175. In making this determination, the appellate court "* * * review[s] the entire record, weighs the evidence and all reasonable inferences therefrom, and considers the credibility of witnesses."Smith, supra. However, the appellate court cannot determine the facts. Id. Credibility determinations are ultimately *Page 16 
a question for the trier of fact alone to make. State v. DeHass (1967),10 Ohio St. 2d 230, 231.
 {¶ 40} In this case, appellant argues that evaluation of the credibility of the witnesses will reveal that the evidence against appellant was very weak. He argues that two eye witnesses to the crime did not testify, Bair and Antonio Escobar. Both of these individuals left after this incident and the state was unable to locate them for trial. Appellant argues that Martinez's testimony is not credible because it conflicts with the testimony of Silva, her identification of appellant may have been tainted by the statements made by Bair, her testimony at trial differed from her statements made after the incident regarding appellant pointing the gun at her, and she misidentified another person at the one-on-one showup. Appellant also argues that Silva's testimony is not credible because it conflicts with the testimony of Martinez and the officer who testified that they were on the scene within a minute after the call. Appellant contends that this questionable testimony, combined with the tainted evidence of Reardon's drug trafficking activities and Bair's out-of-court statements implicating appellant, resulted in a miscarriage of justice.
 {¶ 41} Appellant was charged with aggravated burglary, a violation of R.C. 2911.11(A)(1) and with aggravated robbery, a violation of R.C.2911.01. Appellant was also charged with a firearms specification, R.C.2941.145, for both counts.
 {¶ 42} Upon an examination of all of the evidence, we find that Martinez unequivocally identified appellant by name and by sight as one of the robbers to the first *Page 17 
officer on the scene, during a one-on-one showup, in a photo array, and at trial. She also testified that appellant carried a sawed-off shotgun. While Martinez knew Reardon was involved in the robbery, she was not sure about one of the men in the show up. She specifically noted her uncertainty as to this individual. However, she was able to identify all of the men from a photo array. Silva was not able to corroborate Martinez's testimony because he only saw the first man to enter the house (Reardon) as Silva was exiting. The testimonies of Martinez and Silva do not contradict each other. Rather, the differences in their testimonies are the result of their different positions in the house. It is true that Martinez did not tell the police at the time that appellant had pointed the shotgun at her. Therefore, we agree with appellant that the discrepancies between Martinez's testimony at trial and her statements to the police affect her credibility. However, ultimate credibility determinations are left to the jury. We cannot find that the credibility issue was so overwhelming that a reasonable jury could not find that Martinez's trial testimony was credible.
 {¶ 43} Furthermore, appellant did not demonstrate error regarding the use of Bair's out-of-court statements. Both Martinez's and Silva's identifications were based upon their own opportunities to see the perpetrators. There was no evidence that Bair's statements had any influence on their identifications.
 {¶ 44} Finally, as to Reardon's statements regarding his drug trafficking, he volunteered such information in order to discredit the credibility of Martinez's testimony and Bair's out-of-court statements. As discussed below, such evidence was also *Page 18 
probative of the issue of whether appellant and Reardon acted together and had a motive for the robbery.
 {¶ 45} Therefore, we find that the "credibility issues" identified by appellant did not cause the jury to lose their way in making credibility determinations. In addition, there was other corroborating testimony which also support the conviction. Appellant's girlfriend, Garcia, testified that she was aware that Bair was to receive a large sum of money near the time of the robbery and that Bair had spoken to appellant shortly before the robbery. There was also testimony that appellant was closely associated with the other men involved in the robbery. Officers testified that appellant was found shortly after the crime hiding in Reardon's house along with the other men later identified as the perpetrators. A sawed-off shotgun was also found in the house.
 {¶ 46} Therefore, we find that the convictions were supported by the manifest weight of the evidence. Appellant's second assignment of error is not well-taken.
 {¶ 47} In his third assignment of error, appellant argues that his counsel rendered ineffective assistance of counsel by failing to seek a separate trial for appellant. Furthermore, he argues that the trial court abused its discretion by failing to grant appellant a new trial because of the surprise of Reardon's testimony.
 {¶ 48} Appellant argues that his conviction was based on guilt by association after the jury heard Reardon's incriminating statement that he was a drug dealer. Furthermore, he argues that evidence of Reardon's house being surrounded by a high fence with razor wire would not have been admitted at a separate trial. *Page 19 
 {¶ 49} Appellant bears the burden of proving that his counsel was ineffective since an attorney is presumed competent. Strickland v.Washington (1984), 466 U.S. 668, 687-689, and State v. Lott (1990),51 Ohio St.3d 160, 174, certiorari denied (1990), 498 U.S. 1017. To meet this burden of proof, appellant must show that: (1) there was a substantial violation of the attorney's duty to his client, and (2) the defense was prejudiced by the attorney's actions or breach of duty.Strickland, supra and State v. Smith (1985), 17 Ohio St.3d 98, 100. Prejudice is shown where there is a reasonable probability that a different result would have occurred in the case if the attorney had not erred. State v. Bradley (1989), 42 Ohio St.3d 136, paragraph three of the syllabus, certiorari denied (1990), 497 U.S. 1011, and State v.Noling, 98 Ohio St.3d 44, 2002-Ohio-7044, ¶ 108, certiorari denied (2003), 539 U.S. 907. While the reasonableness of the attorney's conduct must be considered in light of the facts of each case, some general rules have arisen from case law. One general rule is that reasoned tactical decisions cannot form the basis for a claim of ineffective assistance of counsel. State v. Hamblin (1988), 37 Ohio St.3d 153, 157, certiorari denied (1988), 488 U.S. 975.
 {¶ 50} Because joinder of defendants is favored for a variety of reasons, a defendant who seeks a separate trial must demonstrate that his defense will be prejudiced if a separate trial is denied. Crim.R. 8 and State v. Roberts (1980), 62 Ohio St.2d 170. Therefore, Crim.R. 14, provides in relevant part:
 {¶ 51} "If it appears that a defendant * * * is prejudiced by a joinder of offenses or of defendant in an indictment, information, or complaint, or by such joinder for trial *Page 20 
together of indictments, informations or complaints, the trial court shall order an election or separate trial of counts, grant a severance of defendants, or provide such other relief as justice requires. * * * "
 {¶ 52} However, from a defense point of view, joinder of defendants is often a reasonable trial strategy. State v. Langford, 8th Dist. 80753, 2003-Ohio-4173, at ¶ 49; State v. Norman, 8th Dist. No. 80702, 2002-Ohio-6043, at ¶ 50; State v. Van Horn (Mar. 25, 1993), Cuyahoga App. No. 61981, at 3; and State v. Bewsey (June 16, 1993), 9th Dist. No. 15857. It was entirely reasonable in this case that appellant's counsel believed that the evidence regarding the confusion over Reardon's identity and a defense that appellant was just in the wrong place at the wrong time would have resulted in acquittal.
 {¶ 53} Appellant also argues, however, that he did not expect Reardon to admit to drug trafficking, which was detrimental to appellant's defense. Therefore, he contends that the trial court abused its discretion by denying appellant's motion for a new trial on the ground that the motion to sever had to be filed prior to trial.
 {¶ 54} Despite appellant's protests, we find that appellant's trial counsel could have anticipated prior to trial that this evidence would be elicited from Reardon or appellant and sought a separate trial. In fact, it appears to have been Reardon's and appellant's trial tactic to paint the prosecution witnesses as drug users and that they had been wrongly accused because Martinez and Bair wanted to get the defendants out of the neighborhood. Even appellant testified that he had smoked marijuana with his girlfriend and Bair in an *Page 21 
attempt to discredit her identification statements. Appellant was in a better position than the prosecution to know what potentially damaging information could be elicited from him at trial. He based his trial strategy on the use of that information and cannot now claim that he was unfairly prejudiced because it was admitted into evidence.
 {¶ 55} Appellant's third assignment of error is not well-taken.
 {¶ 56} In his fourth assignment of error, appellant argues and appellee concedes that appellant's sentence should be reversed and the case remanded to the trial court for re-sentencing under State v.Foster, 109 Ohio St.3d 1, 2006-Ohio-856. We agree. The trial court imposed more than the minimum sentence based upon its findings under R.C. 2929.14(B). That section has been severed from the sentencing statutes and, therefore, appellant's sentence is void. Id. Appellant's fourth assignment of error is found well-taken.
 {¶ 57} In his fifth assignment of error, appellant argues that appellee engaged in misconduct when he frequently referred to Reardon's drug trafficking activities and used this evidence to impugn appellant's character. Appellant did not object to the prosecution's questioning and comments made during closing arguments.
 {¶ 58} Since appellant did not object to appellee questioning either Reardon or appellant about their drug activities, all error regarding such questioning is waived, except for plain error. State v. Wade
(1978), 53 Ohio St.2d 182, paragraph one of the syllabus. Under Crim.R. 52(B), the court may consider plain errors or defects affecting substantial rights even if they were not brought to the attention of the trial court. *Page 22 
However, such notice is taken "* * * with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." State v. Long (1978), 53 Ohio St.2d 91, paragraph three of the syllabus.
 {¶ 59} Appellant focuses his argument on a belief that Reardon's and appellant's drug involvement were irrelevant to the case and only inflamed the jury and impugned appellant's character. We disagree. This evidence establishes a close relationship between Reardon, appellant, and the others involved in the robbery, as well as a motive for the robbery. Furthermore, Martinez's and Bair's identifications of appellant by name as one of the perpetrators further ensure that appellant's conviction was not the result of a manifest miscarriage of justice.
 {¶ 60} Appellant's fifth assignment of error is not well-taken.
 {¶ 61} Having found that the trial court did not commit prejudicial error as to the issues concerning his conviction but did commit error prejudicial to appellant with respect to his sentencing, the judgment of the Lucas Court of Common Pleas is reversed, in part, and affirmed, in part. This case is remanded to the lower court solely for the purposes of re-sentencing. Appellee is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
 JUDGMENT AFFIRMED, IN PART, AND REVERSED, IN PART. *Page 23 
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
Peter M. Handwork, J., JUDGE Arlene Singer, J., William J. Skow, J., CONCUR.
[1] The United States District Court for the Southern District of Ohio in both Echols v. Houk (S.D. Ohio, 2005) 2005 WL 1745475 and Twitty v.Warden (S.D. Ohio, 2006) 2006 WL 2728694 has cited theThompkins as having been superceded in part by state constitutional amendment on other grounds as stated in State v. Smith,80 Ohio St.3d 89. Later cases have perpetuated this citation. However, we cannot find any basis for this citation. *Page 1